06-4081-cr(Lead), 06-5165(con), 06-4087-cr(con)
USA v. Elgindy

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

------------

August Term, 2008

(Argued: September 3, 2008          Decided: December 17, 2008)

   Docket Nos. 06-4081-cr(Lead), 06-5165(con), 06-4087-cr(con)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

              Appellee,

         - against -

JEFFREY ROYER and AMR I ELGINDY, also known as ANTHONY PACIFIC,
also known as ANTHONY ELGINDY, also known as HERBERT MANNY
VELASCO, also known as HERIBERTO MANNY VELAZCO, also known as
TONY ELGINDY,

              Defendants-Appellants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before:    SACK and KATZMANN, <u>Circuit Judges</u>, and
           RAKOFF, <u>District Judge</u>.[*]

     Amr Elgindy and Jeffrey Royer appeal from their criminal
convictions in the Eastern District of New York (Dearie, J.),
raising, as their principal points, challenges to venue, to the
Government's theories of securities and wire fraud, to the
admission of certain evidence relating to "9/11," and to the
calculation of their sentences.  We affirm.

_____

      [*] The Honorable Jed S. Rakoff, United States District Judge
for the Southern District of New York, sitting by designation.

-1-

JOSHUA L. DRATEL (Meredith Heller, on the
     brief), Law Office of Joshua L. Dratel,
     New York, NY, for Defendant-Appellant
     Elgindy.

LAWRENCE D. GERZOG, New York, NY, for
     Defendant-Appellant Royer.

JOHN A. NATHANSON, Assistant United States
     Attorney (David C. James and Michael J.
     Goldberger, Assistant United States
     Attorneys, on the brief) for Roslynn R.
     Mauskopf, United States Attorney for the
     Eastern District of New York, Brooklyn, NY,
     for Appellee.

RAKOFF, District Judge:

Amr I. Elgindy and Jeffrey Royer appeal from judgments of conviction entered in the United States District Court for the Eastern District of New York (Dearie, J.) following a twelve-week jury trial.

Elgindy was convicted by the jury of racketeering conspiracy in violation of 18 U.S.C. § 1962(c), securities fraud conspiracy in violation of 18 U.S.C. § 371, five substantive counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, one count of conspiracy to commit extortion and one substantive count of extortion, both in violation of 18 U.S.C. § 1951(a), and two counts of wire fraud in violation of 18 U.S.C. § 1343.[1]  In addition, Elgindy pleaded guilty to a separate indictment

---

[1] The jury acquitted Elgindy of eight substantive counts of securities fraud, one count of extortion, one count of conspiracy to obstruct justice, one count of obstruction of justice, and seven counts of wire fraud.

-2-

(combined with the jury verdict for purposes of sentencing and entry of the judgment here appealed), which charged him with making false statements to representatives of the Transportation Safety Authority in violation of 18 U.S.C. § 1001 and with committing an offense while on pretrial release in violation of 18 U.S.C. § 3147. Elgindy was sentenced principally to a term of 135 months' imprisonment.

Royer was convicted by the jury of **racketeering conspiracy in violation of** 18 U.S.C. § 1962(c), securities fraud conspiracy in violation of 18 U.S.C. § 371, four substantive counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, conspiracy to obstruct justice in violation of 18 U.S.C. § 371, obstruction of justice in violation of 18 U.S.C. § 1503, and witness tampering in violation of 18 U.S.C. § 1512(b)(3).[2] Royer was sentenced principally to a term of 72 months' imprisonment.

On appeal, Elgindy and Royer jointly and severally raise a host of issues, but the only ones that merit discussion relate to venue, the adequacy of the jury instructions and legal theories underlying the securities fraud and wire fraud counts, the admission of evidence related to the events of September 11, 2001 ("9/11"), and the calculation of the sentences. We construe the facts most favorably to the Government.

---

[2] The jury acquitted Royer of ten substantive counts of securities fraud, two counts of extortion, one count of conspiracy to commit extortion, and ten counts of wire fraud.

In 1998, Elgindy founded a company called Pacific Equity Investigations that administered two websites, one that was publicly accessible with the address "www.InsideTruth.com" ("the InsideTruth site") and one that was available only to paying subscribers with the address "www.AnthonyPacific.com" ("the AP site").[3]  The InsideTruth site presented itself as a research tool that sought to uncover and reveal negative information about publicly-traded companies.  The AP site sought to profit from these revelations by providing its subscribers with recommendations about which stocks to "short."[4]

In 2000, through a co-conspirator named Derrick Cleveland (who testified for the Government at trial), Elgindy began receiving misappropriated information from co-defendant Jeffrey Royer, who was then a Special Agent of the Federal Bureau of Investigation ("FBI") in Oklahoma City.  In the early summer of 2000, Royer informed Cleveland of the existence of an ongoing government investigation of a company called Broadband Wireless ("BBAN").  Cleveland passed the information on to Elgindy, who then profited by shorting shares of BBAN.  As a result of this

---

[3] Subscribers paid between $200 and $600 per month for membership.

[4] In "short-selling," or "shorting," the seller typically sells at the prevailing market price stock that he does not yet own but has arranged to purchase later at the subsequent market price, so that, if the price drops in the interim, he realizes a profit.  Put another way, a short-seller is betting on a short-term decline in the market price of a given security.

success, Elgindy solicited Cleveland to relay further such confidential law enforcement information from Royer. Eventually, Royer began passing information directly to Elgindy, as well as passing information through Cleveland.

As the scheme evolved, Royer, who was assigned to the FBI's "white collar crime" unit, would obtain confidential information by performing searches in the FBI's Automated Case Support computer database and in the criminal history database maintained by the National Crime Information Center, as well as by contacting personnel of the Securities and Exchange Commission ("SEC") and asking them to perform searches in the SEC's confidential Name Relationship Search Index database. Royer would convey the misappropriated information to Elgindy, who would in turn convey the gist of it to subscribers to the AP site and instruct the AP site members to short the stock but not yet release the information to the public. Then, when Elgindy gave the signal, the AP site members would use the InsideTruth site and other media to disseminate the misappropriated information to the general public, and thereby profit from the resulting drop in the stock's price. Elgindy kept close control over his AP site subscribers and even threatened to exclude them from the site if they failed to follow his trading instructions.

In addition, Elgindy himself traded on the misappropriated information, sometimes even in advance of when he released it to

the AP members or when he directed them to trade on its basis (a practice called "front running"). Elgindy and Royer also manipulated prices in the relevant securities by orchestrating trades by AP site subscribers in thinly traded stocks.

In January 2002, both Royer and Cleveland began working for Elgindy at his San Diego office. Even though Royer had now left the FBI, he continued to unlawfully obtain confidential law enforcement information from his girlfriend, Lynn Wingate, who still worked for the FBI, and from a friend named Michael Mitchell, who was a police officer in Gallup, New Mexico.

Elgindy also used the unlawfully obtained information for the purpose of extortion. Specifically, after Royer provided Elgindy with information that Paul Brown, the CEO of a company called Nuclear Solutions ("NSOL"), had previously been convicted of a felony drug charge but that the conviction had been expunged, Elgindy posted the information on the AP site, describing Brown, inaccurately, as a "three time felon." Elgindy and the AP site members then heavily shorted NSOL stock, causing its price to decline. Thereupon, Elgindy informed Brown that he and the AP site members would leave Brown alone only on the condition that Brown give Elgindy a discounted block of NSOL stock to cover their short positions. Brown signed an agreement with Troy Peters (one of Elgindy's accomplices who pled guilty to participation in the extortion conspiracy), pursuant to which

Peters' company would purportedly provide investment banking services to NSOL in exchange for stock in the company. No such services were ever provided, however, and the agreement merely served as a cover to transfer shares to Elgindy and others.[5]

Elgindy further used his connection with Royer to learn whether he himself was under investigation. On several occasions prior to September 11, 2001, Elgindy requested, both directly and through Cleveland, that Royer find out whether Elgindy was the target of any ongoing investigation. Thereafter, in late September 2001, Royer learned that Elgindy was a subject of a government investigation in the Eastern District of New York into individuals who had made significant securities trades immediately prior to 9/11. Elgindy drew the investigators' attention because he had made contributions to a charity called "Mercy USA" that the investigators believed had links to terrorist organizations and because, on September 10, 2001, he had attempted to liquidate his children's investment accounts. Royer passed at least some of this information on to Elgindy.

The government also introduced evidence that Elgindy subsequently traveled to Lebanon without the permission of his

---

[5] Elgindy was acquitted of another extortion charge involving a company called Flor Decor ("FLOR") and its CEO, A.J. Nassar. Royer was acquitted of all extortion counts.

probation officer in November 2001,[6] arranged to buy an apartment there, and transferred money to a Lebanese bank account. He also asked Royer to write a letter to the District Court of the Northern District of Texas recommending that Elgindy's term of supervised release be terminated early.

Shortly before Royer left the FBI in late 2001, he was interviewed about Elgindy. In the course of this interview, he falsely stated that, although Elgindy had offered him a job, he did not plan to work for Elgindy until the FBI investigation had been concluded. He also falsely stated that he had never provided confidential law enforcement information to Elgindy.

As mentioned, Royer, after leaving the FBI, continued to obtain confidential information from, among others, Michael Mitchell, whom Royer asked to run searches in law enforcement databases. Royer falsely told Mitchell that the searches were relevant to work on continuing FBI investigations. After Royer was arrested, he contacted Mitchell and told him repeatedly that he had told the FBI that he had only asked Mitchell to run one search. Mitchell understood Royer to be asking him to lie to the FBI if he was interviewed about the multiple searches he had performed for Royer.

---

[6] In 2000, Elgindy, after completing a term of imprisonment on unrelated federal charges, had begun serving a term of supervised release.

A grand jury in the Eastern District of New York returned an indictment against Elgindy, Royer, and others in May 2002, and a second superseding indictment in September 2004. On April 17, 2004, after he had been arrested and released on bail, Elgindy went to MacArthur Airport on Long Island and tried to board a plane with false identification. He was traveling under the name "Herbert Manny Velasco" and had with him several pieces of identification bearing variants of that fictitious name, as well as approximately $25,000 in cash, more than $30,000 worth of jewelry, blank checks for a bank account belonging to his mother, and blank checks for an account created in his own name and listing his country of residence as Lebanon. Elgindy falsely told the arresting authorities that his name was Manny Velasco, that he was a jewelry dealer, and that Amr Elgindy, whose name appeared on several documents and prescriptions in his possession, was his lawyer. He finally admitted his true identity when the officers found his California driver's license.

Against this background, we turn to the principal points raised by defendants on this appeal.

Venue

As to each count of which one or both defendants was convicted at trial, the jury found, by a preponderance of the evidence, that venue was proper in the Eastern District of New

-9-

York.  Both defendants challenge the sufficiency of the evidence supporting these findings.[7]

Venue raises both constitutional and statutory concerns. Article III of the Constitution states that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. art. III, § 2, cl. 3. The Sixth Amendment declares that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law."  U.S. Const. amend. VI.[8]  In the Second Circuit,

> there is no single defined policy or mechanical test to determine constitutional venue.  Rather, the test is best described as a substantial contacts rule that takes into account a number of factors -- the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding . . . .

United States v. Reed, 773 F.2d 477, 481 (2d Cir. 1985).

---

[7] Elgindy also argues that, under his reading of Apprendi v. New Jersey, 530 U.S. 466 (2000), and various other cases, the Government was required to prove venue by proof beyond a reasonable doubt.  This argument is foreclosed in this Circuit. See, e.g., United States v. Rommy, 506 F.3d 108, 119 (2d Cir. 2007); United States v. Chen, 378 F.3d 151, 159 (2d Cir. 2004); United States v. Svoboda, 347 F.3d 471, 485 (2d Cir. 2003).

[8] Technically, Article III specifies "venue" and the Sixth Amendment specifies "vicinage," but that refined distinction is no longer of practical importance.  See 2 Charles Alan Wright, Federal Practice and Procedure § 301 (3d ed. 2000); see also Brian C. Kalt, Essay, The Perfect Crime, 93 Geo. L. J. 675 (2005) (discussing perhaps the only circumstance in which the distinction between venue and vicinage might bear any significance).

By rule, venue lies "in a district where the offense was committed." Fed. R. Crim. P. 18. Congress, however, has provided that, absent an express statutory provision to the contrary, "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). See United States v. Johnson, 323 U.S. 273, 275 (1944) (noting that venue for the prosecution of "continuing offenses" is proper in any district "through which force propelled by an offender operates"). This statute has particular applicability where, as here, the use of modern communications facilities to execute a sophisticated criminal scheme inherently contemplates activities throughout many parts of the country. See United States v. Rowe, 414 F.3d 271, 279 (2d Cir. 2005) ("Section 3237(a)'s language is broad, and Rowe's act of publishing an internet advertisement to trade child pornography can readily be described as an 'offense involving . . . transportation in interstate . . . commerce.'").

Where multiple crimes are charged in a single indictment, the Second Circuit has held that "venue must be laid in a district where all the counts may be tried." United States v. Saavedra, 223 F.3d 85, 89 (2d Cir. 2000). Accordingly, we must consider the appropriateness of venue with regard to each of the counts of which the defendants were convicted.

-11-

We begin with the counts of substantive securities fraud. The Securities Exchange Act of 1934 provides that "[a]ny criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa. See United States v. Geibel, 369 F.3d 682, 696 (2d Cir. 2004). To justify venue in the Eastern District of New York, the Government relies, first, on evidence that seven of the limited number of subscribers to the AP site were located in the Eastern District of New York and that Elgindy sent hundreds of messages to AP site subscribers conveying the information misappropriated by Royer, including information relating to the specific stocks involved in the securities fraud counts of which defendants were convicted. In addition, trades in the securities affected by the defendants' manipulative activities were made during the relevant time frame by investors residing in the Eastern District of New York, and market makers who made markets in many of those stocks were located in the Eastern District of New York.[9]

---

[9] There were also certain venue-related events that pertained to individual securities fraud counts. For example, Research Frontiers ("REFR"), one of the companies about which Royer misappropriated and disseminated confidential information, was located in the Eastern District of New York. A co-conspirator of Elgindy who posted material on the AP site arranged to have a picture taken of REFR's headquarters on Long Island. Also, an AP site subscriber with the screen name "WhoLovesYa," who resided in the Eastern District of New York, participated in preparing a report for Elgindy's InsideTruth website on Seaview Underwater Research ("SEVU"), one of the companies named in a securities fraud, which report was intended to drive down the price of SEVU stock.

We have stated that "venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue [and it does]." United States v. Svoboda, 347 F.3d 471, 483 (2d Cir. 2003). In the instant case, no fewer than seven AP site subscribers resided in the Eastern District of New York during the period of the various securities fraud schemes of which the defendants were convicted, and all but one was an AP subscriber throughout this period. Although no direct evidence of their trades was presented to the jury, that is of no moment to our analysis. Venue need only be proved by a preponderance of the evidence, and the jury could reasonably infer that it was more likely than not that one or more of these subscribers traded in the applicable securities, since there were at most some 300 AP subscribers in total, such trading was the very purpose of subscribing (at a price) to the AP site, and Elgindy exercised tight control over the AP site subscribers.

Moreover, quite aside from any trading, a jury could reasonably infer that it was more likely than not that, with respect to each security, one or more of the subscribers, in accordance with Elgindy's strict instructions, disseminated Royer's misappropriated information so as to put artificial downward pressure on the market. This manipulation, in turn, impacted not only the documented purchases of relevant securities

made by non-AP investors resident in the Eastern District of New York but also the market makers in these stocks, whose role depended on the market operating free of manipulation.

Here, by contrast with such cases as United States v. Geibel, 369 F.3d 682 (2d Cir. 2004) (holding venue improper where actions taken in the Southern District of New York were "anterior and remote to" the criminal conduct), the actions of the AP site subscribers, the market makers, and the investors were crucial to the success of the scheme. And at a minimum, the jury could infer by a preponderance that the subscribers in the Eastern District of New York received information about these stocks from Elgindy. Receipt of electronic transmissions in a district is sufficient to establish venue activity there. See, e.g., Rowe, 414 F.3d at 279 (holding venue in Southern District of New York proper for conviction of advertising to receive, exchange or distribute child pornography when defendant posted an advertisement on the Internet, which a law enforcement official viewed in the district).

As noted, in this Circuit, venue must not only involve some activity in the situs district but also satisfy the "substantial contacts" test of Reed, which requires consideration of such factors as "the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of the [venue] for accurate factfinding." Reed, 773 F.2d at 481. But here, as discussed

-14-

above, the first three factors are plainly satisfied, for the defendants orchestrated activity in the Eastern District of New York that was intended to, and did, effectuate their scheme. Nor, as to the fourth factor, is the Eastern District any less suitable for accurate factfinding than any other district involved in the scheme's implementation. Indeed, the defendants, having concocted a scheme that relied so heavily on the actions of the AP site subscribers for its success and that defrauded investors throughout the country, can hardly complain that their very modus operandi subjected them to prosecution in numerous districts, including the Eastern District of New York.

Elgindy also challenges the jury's finding that venue was proper with respect to the substantive extortion count and extortion conspiracy count of which he was convicted. He argues once again that the Government has failed to show that he or, in the case of the conspiracy charge, a co-conspirator took an action in furtherance of the extortion scheme in the Eastern District of New York. The Government, in turn, makes a similar argument to the one it made about the securities fraud counts: that Elgindy's extortionate acts were dependent on the communication of information to AP site subscribers and the control exercised over their further dissemination of that information and that the presence of seven of the subscribers in the Eastern District establishes sufficient contacts for venue

-15-

purposes.[10]  They also point to specific evidence documenting that "WhoLovesYa," a resident of the Eastern District, was an active participant in communications concerning Paul Brown, CEO of NSOL, who was the target of the extortion scheme of which Elgindy was ultimately convicted.

It is useful on this point to recall the nature of the extortion scheme in which Elgindy was engaged.  After misappropriating, with Royer's help, information about the publicly expunged criminal record of Brown, Elgindy informed the AP site subscribers that Brown was a "three time felon" and directed them to short NSOL stock.  This downward pressure on NSOL's stock price, in turn, provided Elgindy with the ammunition to extort Brown into transferring a block of NSOL stock to Elgindy, and it had the intended effect.  In other words, a critical component of creating the requisite fear in Brown so that the extortion would succeed was the concerted trading activity of the AP site subscribers, led by Elgindy.

The record below documents that WhoLovesYa, who resided in the Eastern District of New York, was an active participant in these events.  In one chat session, after Elgindy gave his subscribers the go-ahead to short NSOL stock (apparently because

---

[10] The fact that the AP site subscribers were not expressly named as co-conspirators is irrelevant.  Their actions were either caused by Elgindy and Royer or, at a minimum, were a foreseeable result of the defendants' actions.  Svoboda, 347 F.3d at 483.

Brown was not providing the demanded block of stock rapidly enough), WhoLovesYa commented "Brown[']s gone, all bets are off." "Anthony" -- Elgindy's screen name -- then wrote, "NSOL e short 15% at $1.15. Don't forget the CEO is now worm food and they have no product or revenues." WhoLovesYa also offered to investigate whether Brown possessed a license to carry concealed weapons so as to independently verify the information Royer had obtained about his criminal record and discussed having placed a phone call to an Idaho weapons agency to this end.

It is thus evident that venue for the substantive extortion count and the extortion conspiracy count properly lay in the Eastern District of New York.

Although defendants also challenge venue with respect to the securities fraud conspiracy and the RICO conspiracy counts, their challenge need not long detain us. In a conspiracy prosecution, venue is proper in any district in which "an overt act in furtherance of the conspiracy was committed." United States v. Naranjo, 14 F.3d 145, 147 (2d Cir. 1994). This includes not just acts by co-conspirators but also acts that the conspirators caused others to take that materially furthered the ends of the conspiracy. See Svoboda, 347 F.3d at 483 (stating that venue is proper in a district where the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur). The defendants' transmission of confidential information to the AP site subscribers in the Eastern District of New York,

-17-

as well as the acts that a reasonable jury could find were more likely than not taken by the AP site subscribers in the Eastern District of New York, are sufficient in themselves to meet this standard for both the securities fraud and RICO conspiracies (as were the acts of WhoLovesYa for the extortion conspiracy).

Moreover, Royer's obstruction of justice conviction also connects the securities fraud conspiracy to the Eastern District of New York. Royer alerted Elgindy to the fact that he was under investigation after September 11, 2001, and he continued to monitor the progress of that investigation and to pass on the information he obtained to Cleveland and Elgindy. Shortly before leaving the FBI, he also falsely told FBI investigators that he had never provided confidential law enforcement information to Elgindy. These actions were taken in furtherance of the securities fraud conspiracy: their purpose was to allow the scheme to continue by protecting Elgindy from law enforcement authorities and to conceal the fact of the information-sharing arrangement among Royer, Cleveland, and Elgindy. Because these actions were taken to impede a grand jury investigation in the Eastern District of New York, they establish the requisite contacts with that district for the securities fraud conspiracy charge as well.

The RICO conspiracy does not call for a fundamentally different analysis. To be sure, we expressed some concern in Saavedra that RICO, given its breadth, not be interpreted to

-18-

permit venue to lie automatically in every district where a member of the enterprise has conducted some criminal activity. 223 F.3d at 93-94. But we also explained in Saavedra that the application of the Reed factors in every case will ensure that venue is only found where there are enough substantial contacts to ensure that prosecution is fair to the defendant. Id. at 94.

In this case, Elgindy was convicted under 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Among the acts that make up the pattern of racketeering activity are Elgindy's direction of communications to the AP site subscribers located in the Eastern District and Royer's obstruction of the grand jury investigation in the Eastern District. The former establishes substantial contacts in light of Reed's directive to consider the elements and nature of the crime, as the communications were central to the fraudulent scheme that gave the enterprise its primary purpose. The latter establishes substantial contacts when viewed in light of Reed's directive to consider the place where the effect of the criminal conduct occurs, as the repercussions of Royer's actions were felt by the Eastern District grand jury whose investigation he impeded.

We have considered defendants' other arguments regarding venue and find them to be without merit.

Securities Fraud and Wire Fraud

The defendants challenge their securities fraud and wire fraud convictions on numerous grounds, the most colorable of which are here addressed. The securities fraud counts went to the jury on two alternative theories: first, that the defendants unlawfully traded in various securities on the basis of material confidential information that Royer had misappropriated and then shared with Elgindy for the purpose of securities trading, see United States v. O'Hagan, 521 U.S. 642, 651-52 (1997), and, second, a market manipulation theory involving the defendants' orchestration of trading by themselves and the AP site members in order to artificially affect the market prices of various thinly traded securities, see Gurary v. Winehouse, 190 F.3d 37, 44-46 (2d Cir. 1999).

With regard to the first theory, the defendants argue that even if Royer improperly obtained the law enforcement information here at issue from confidential law enforcement reports, much of the information reflected in those reports was also publicly available and therefore any related trading was not trading on "nonpublic" confidential information. See SEC v. Mayhew, 121 F.3d 44, 50 (2d Cir. 1997). The Government does not dispute that

-20-

someone who knew where to look could have lawfully discovered some of the information that Royer obtained improperly from nonpublic law enforcement reports, but it argues that, as the district court instructed the jury, the fact that information may be found publicly if one knows where to look does not make the information "public" for securities trading purposes unless it is readily available, broadly disseminated, or the like.

In so concluding, the district court relied on the Supreme Court's decision in United States Department of Justice v. Reporters Committee for Freedom of the Press, 489 U.S. 749, 751 (1989), in which the Court considered whether the disclosure of criminal histories compiled by the FBI could reasonably be expected to constitute an unwarranted invasion of personal privacy within the meaning of the "privacy" exemption from disclosure under the Freedom of Information Act. In upholding the application of that exemption, the Court distinguished criminal history information that a member of the public could obtain only with difficulty from information that was "freely available."

> The very fact that federal funds have been spent to prepare, index, and maintain these criminal-history files demonstrates that the individual items of information in the summaries would not otherwise be "freely available" either to the officials who have access to the underlying files or to the general public. Indeed, if the summaries were "freely available," there would be no reason to invoke the FOIA to obtain access to the information they contain.

Id. at 764. Although the Supreme Court's interpretation of FOIA

-21-

is not directly applicable to the issue presented in the instant case, its logic is highly instructive.  The law enforcement reports that Royer misappropriated were not themselves public in any practical sense, even if some of the sources from which they were compiled could be accessed by the public.  Moreover, the manner in which law enforcement information was combined in the reports was itself nonpublic and helped inform its relevance for trading purposes.  See United States v. Winans, 612 F. Supp. 827, 832 (S.D.N.Y. 1985) (although all the information in reporter's published columns was public, the "timing, subject and tenor" of the misappropriated columns was not public prior to publication), aff'd in relevant part sub nom. United States v. Carpenter, 791 F.2d 1024, 1031-32 (2d Cir. 1986), aff'd, 484 U.S. 19 (1987) . While the trial court's instruction here given might not be universally appropriate, in the factual context of this case it correctly stated the relevant principles the jury needed to apply.[11]

---

[11] Although Royer also objects to the district court's instruction that "[t]o constitute non-public information, information must be specific and more private than general rumor," the language the district court used was drawn almost verbatim from our decision in United States v. Mylett.  See 97 F.3d 663, 666 (2d Cir. 1996) ("To constitute non-public information under the act, information must be specific and more private than general rumor.").  Contrary to defendants' assertions, the evidence presented to the jury readily established that the information obtained by Royer with regard to each of the securities here in question was obtained from confidential reports that combined information that could be obtained publicly, albeit with difficulty, and information that was entirely private.

Alternatively, defendants argue that their actions cannot be the basis of a securities fraud conviction because they disclosed both the information and its source to the AP site subscribers. However, as the district court correctly instructed the jury, when someone misappropriates material nonpublic information, he

> is obligated, under the law, either to disclose the information to make it public, or to abstain from trading.
> When an investor with such information chooses to disclose it, the non-public information remains non-public for purposes of the insider trading laws until it has been disseminated in a manner sufficient to insure its availability to the investing public or to insure that the market has had an opportunity to "absorb" the disclosed information such that the company's stock price has already adjusted to reflect that information.

Tr. at 8839. See Mayhew, 121 F.3d at 50. Elgindy's disclosure of the confidential law enforcement information he obtained from Royer to the AP site subscribers did not accomplish the necessary public dissemination.

Finally, defendants also argue that it was error to instruct the jury that it could convict the defendants if the defendants traded while in "knowing possession" of nonpublic information material to those trades, as oppposed to requiring proof that the defendants "used" such information in making the trades. But we previously resolved this issue in favor of the "knowing possession" standard in United States v. Teicher, 987 F.2d 112, 119-21 (2d Cir. 1993) and while this resolution was arguably dictum, it was the product of sustained and detailed consideration as set forth in the opinion. Nothing that has

-23-

developed since persuades us of any different resolution.  On the contrary, the SEC subsequently enacted Rule 10b5-1, adopting a knowing possession standard, and that determination is itself entitled to deference.  See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984); Roth ex rel. Beacon Power Corp. v. Perseus L.L.C., 522 F.3d 242, 249 (2d Cir. 2008) (holding that SEC rules are entitled to Chevron deference).  We consequently adhere to the knowing possession standard articulated in Teicher.[12]

With respect to the Government's alternative theory of liability -- market manipulation -- the district court instructed the jury as follows:

> The essential element of manipulation is the deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay

---

[12] Moreover, the jury instruction actually given by the district court here was, if anything, more favorable to the defendants than a "knowing possession" standard requires.  The district court's instruction read:

> A purchase or sale of a security is "on the basis of" material non-public information about that security, if the person making the purchase or sale was aware of the material non-public information when the person made the purchase or sale, and the information in some way informed the investment decision.

Tr. at 8841-42 (emphasis supplied).  The emphasized language appears to require more of a causal connection between the possession of the information and the trade in the security concerned than would be demanded under a knowing possession standard.

-24-

of supply and demand.[13]  Consequently, any conduct that is designed to deceive or defraud investors by controlling or artificially affecting the price of securities is prohibited.  Congress intended that Section 10(b) prevent fraud, whether it is a garden variety fraud, or a unique, novel or atypical form of deception.

Market manipulation may be accomplished through a variety of means or ways undertaken either alone or in combination.  The government alleges that the defendants engaged in a variety of conduct designed to impact artificially the price of stocks, including by making materially false and misleading public statements on the InsideTruth.com website and on the Internet and by coordinating their trading of the stocks of certain companies for the purpose of impacting the price of the stock.  I instruct you, however, that group trading by itself without the intent to deceive and defraud is not market manipulation.  Similarly, the dissemination of truthful information, negative or not, into the marketplace by itself is not market manipulation.

Tr. at 8844-45 (emphases supplied).  Defendants argue that this instruction was erroneous because it arguably allowed for conviction without a finding that the defendants disseminated false information to the marketplace.  However, the statute here in issue, § 10(b) of the Securities Exchange Act of 1934, simply prohibits the use of "any manipulative or deceptive device or contrivance" in contravention of SEC rule.  15 U.S.C. § 78j(b).  This broad language, on its face, extends to manipulation of all kinds, whether by making false statements or otherwise.  Rule 10b-5, in turn, prohibits not only conventional frauds brought about by making materially false or misleading statements, see Chiarella v. United States, 445 U.S. 222, 227-28 (1980), but also

---

[13] The language of this first sentence is drawn directly from our decision in Gurary, 190 F.3d at 45.

so-called "constructive frauds," i.e., other forms of misconduct that have the same practical effect as a conventional fraud. Specifically, the third alternative prong of Rule 10b-5 prohibits any person from "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 CFR § 240.10b-5(c). As the Supreme Court recently confirmed, "[c]onduct itself can be deceptive," and so liability under § 10(b) and Rule 10b-5 does not require "a specific oral or written statement." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. _, 128 S. Ct. 761, 769 (2008); see United States v. Finnerty, 533 F.3d 143, 148 (2d Cir. 2008).

Accordingly, in United States v. Regan, 937 F.2d 823, 829 (2d Cir. 1991), we sustained a conviction under Rule 10b-5 of the underwriter of a convertible bond offering who attempted to depress the stock price of the issuer by arranging for artificial short sales to a broker-dealer. Similarly, in Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 792-98 (2d Cir. 1969), we held that Rule 10b-5 was violated when the defendant sought to thwart a tender offer by purchasing the target company's stock on the open market at increasingly higher prices while simultaneously secretly selling the stock in off-market sales. In the present case, the defendants sought to artificially affect the prices of various securities by directing the AP site subscribers to trade and to disclose the negative information at

times and in manners orchestrated by the defendants that were dictated not by market forces, but by defendants' desire to manipulate the market for their own benefit. It would be hard to imagine conduct that more squarely meets the ordinary meaning of "manipulation."

Defendant Elgindy also challenges the legal basis of the two wire fraud counts of which he was convicted. These counts concern Elgindy's practices of trading against his advice to his AP site subscribers and his related practice of "front running," i.e., making his own trades before advising the site subscribers to trade in a security and thus guaranteeing himself increased profits. Both of these alleged practices were presented to the jury as violations of the prong of the wire fraud statute that prohibits use of interstate or international wire communications in execution of a scheme "to deprive another of the intangible right of honest services." 18 U.S.C. §§ 1343, 1346. Specifically, the Government alleged that Elgindy, by trading against his advice to the AP site subscribers and trading in advance of the trades he directed them to make, cheated his AP site subscribers of the honest services he owed them. Elgindy, however, contends that no such duty was owed.

We have explained that

the term "scheme or artifice to deprive another of the intangible right to honest services" in section 1346, when applied to private actors, means a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity (or a person in a relationship that gives

-27-

rise to a duty of loyalty comparable to that owed by employees to employers) purporting to act for and in the interests of his or her employer (or of the other person to whom the duty of loyalty is owed) secretly to act in his or her or the defendant's own interests instead, accompanied by a material misrepresentation made or omission of information disclosed to the employer or other person.

United States v. Rybicki, 354 F.3d 124, 141-42 (2d Cir. 2003) (en banc) (footnote omitted). Applying this standard to the facts of this case, we find that Elgindy owed the requisite duty of honest services to the AP site subscribers. Elgindy charged his subscribers fees of $200 to $600 per month; he specifically warranted on his website that he would not front run or trade against advice; and he not only offered investment advice to his subscribers, he specifically directed their trading activities and threatened to remove them from the site if they did not follow his instructions. While an investment advisor does not automatically owe a duty of honest services to those who rely on her advice, in this case Elgindy took numerous affirmative steps to create a relationship in which, for a price, his subscribers agreed to let him, in effect, dictate their trades, secure in his promise that he would not undercut their trades for his own benefit. This was more than enough to create a duty of honest services, which Elgindy then blatantly breached.[14]

---

[14] Although Elgindy contends that the Government failed to show any detriment to his subscribers, this is plainly untrue, since they paid him $200-$600 for his honest services and received dishonest services instead.

-28-

9/11 Evidence

Elgindy and Royer argue on appeal that evidence admitted by the district court concerning the FBI's post-9/11 investigation of Elgindy's possible ties to the 9/11 terrorist attacks was unfairly prejudicial, that the district court abused its discretion in admitting the evidence, and that as a result they were denied a fair trial.

Federal Rule of Evidence 403 allows relevant evidence to be excluded by the trial court if "its probative value is substantially outweighed by" such dangers as "unfair prejudice." Fed. R. Evid. 403. On appeal, our review of the district court's Rule 403 rulings is tightly limited in recognition of a trial court's superior position to assess both the probative value and the prejudicial potential of evidence presented at trial; those rulings must stand absent an abuse of discretion. United States v. Birney, 686 F.2d 102, 106 (2d Cir. 1982); United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980). While "evidence linking a defendant to terrorism in a trial in which he is not charged with terrorism is likely to cause undue prejudice," United States v. Elfgeeh, 515 F.3d 100, 127 (2d Cir. 2008), the potential for prejudice is only part of the equation, see, e.g., United States v. Salameh, 152 F.3d 88, 123 (2d Cir. 1998) (per curiam) (holding that, in the trial of the participants in the 1993 World Trade Center bombing, victim testimony and photographs

-29-

of the scene of the bombing were not improperly admitted into evidence).  Indeed, in Elfgeeh, we held that, despite the fact that a witness's testimony had suggested that defendant was suspected of funding terrorism, defendant was not entitled to a new trial, in part because the district court gave timely cautionary instructions, as the district court did here, and thus reduced the potential for prejudice.  515 F.3d at 127.

Here, Royer's illicit efforts to find out whether Elgindy was under investigation and his discovery, unlawfully conveyed to Elgindy, that Elgindy was suspected (wrongly, as it turned out) of having advance knowledge of the 9/11 attacks, was directly relevant to the obstruction and racketeering charges, among others.[15]  Nevertheless, the district court was at pains to limit the amount and impact of such evidence because of the risk of prejudice.  Before Cleveland testified about the information that Royer passed on to him about the investigation into Elgindy's supposed 9/11 connections, the court limited the testimony he could offer, prohibiting, for example, any reference to al Qaeda and any attempt to elicit testimony suggesting that Elgindy's brother, who worked at the Pentagon, left just before the attack.

---

[15] The district court observed at one point that "if that prong of this case were not about 911 and were about some other conduct . . . the whole case would have come in, not for the truth, but to tell the jury about the nature, depth and seriousness of the investigation because it's directly relevant to the crime of obstruction.  I've hamstrung the government, for good reason, and at [defense counsel's] urging . . . ."

Later, after Cleveland testified that Royer had informed him that Elgindy was under investigation and that the topic of the investigation was "terrorism," the district court instructed the jury that "[t]his case has nothing to do with terrorism. I want to make that point very strongly to you. There are no such charges in this case . . . and you will not hear any evidence that Mr. Elgindy or anyone else was involved in or aided the events of September 11th. Please understand this." The testimony throughout the rest of the Government's case included only a few general references to the fact that Elgindy was under investigation by the FBI in late 2001 and a handful of specific statements indicating that the investigation explored possible ties between Elgindy and 9/11 or terrorism.

However, when defendant Royer took the stand, he testified that at various times he had worked first to prevent and then investigate the 9/11 terrorist attacks, and this was a subject of cross-examination by the Government, though the scope of the cross was again limited by the court. Specifically, in his direct testimony, Royer portrayed himself as having worked in cooperation with Elgindy and Cleveland in the wake of 9/11 to try to track down leads relating to the attacks, dismissed the suggestion that there was any basis to believe at the time that Elgindy was involved in 9/11, and denied sharing with Elgindy the fact that he was under investigation. The district court notified the government that, although Royer's testimony did open

the door to further questioning about the post-9/11 terrorism-related investigation into Elgindy, it would keep "a very short tether on this."  Royer was then cross-examined about the nature of the investigation and the contents of FBI reports suggesting that Elgindy may have been involved in terrorism.  The district court instructed the jury that the statements contained in the reports were hearsay.

Finally, a rebuttal witness, Agent James Fitzgerald of the FBI, testified briefly about the Zacharias Moussaoui case, testimony that was allowed in order to rebut Royer's claim that he had possessed information that could have led to the interception of the 9/11 hijackers if only his superiors at the FBI had heeded his urging to act on it.  Additionally, the Government asked Michael Mitchell to confirm that Royer had told him that Elgindy was under investigation for terrorism-related matters involving a Middle Eastern charity.  This testimony was allowed only after the district court had considered the Government's arguments for its necessity and the defense's arguments against admitting it; offered to give a limiting instruction to the jury; and then decided, at the defense's request, not to give such an instruction because it would draw too much attention to the testimony.[16]

---

[16] Additionally, Elgindy's own counsel put questions to Royer regarding an alleged link between one of the stocks Elgindy shorted (Genesisintermedia.com, or "GENI") and Osama Bin Laden, a line of questioning that was apparently meant to suggest that

The record thus demonstrates that, far from abusing its discretion, the district court engaged in precisely the sort of "conscientious assessment" that our precedents require. See Birney, 686 F.2d at 106; Figueroa, 618 F.2d at 943. It carefully weighed the probative value of the 9/11-related evidence the Government wished to offer, excluded that evidence that was more potentially prejudicial than probative (such as references to Al Qaeda), issued limiting instructions to the jury on several occasions, and continued to keep tight control over the introduction of such evidence even after defendant Royer's testimony explicitly addressed the topic of 9/11.

It remains only to add that Elgindy was, in the end, acquitted of the obstruction of justice charges, which were the charges most directly linked to the 9/11-related evidence. This only serves to reconfirm that the district court's careful efforts to remove any unfair prejudice from the introduction of 9/11-related evidence were extremely successful.[17]

---

Elgindy was a source rather than a target in a 9/11-related FBI investigation.

[17] For the same reasons, we reject defendants' arguments that the district court abused its discretion in refusing to sever their trials in light of the potential for prejudice from 9/11-related evidence.
    As for Elgindy's claim that the district court erred in failing to question jurors about possible 9/11-related prejudice during voir dire, the fact is that Elgindy's counsel expressly declined to request such questions.

<u>Sentencing</u>

Both Elgindy and Royer challenge the sentences the district court imposed on them.

The central dispute concerning Elgindy's sentence is the calculation of the gain amount used to determine both his offense level under the Guidelines and his forfeiture amount. The district court decided, after considering all of the relevant conduct, that the appropriate provision of the Sentencing Guidelines to apply in Elgindy's case was § 2B1.4, the insider trading provision. (The Government had urged the court to use § 2B1.1, which applies to market manipulation and specifies a higher offense level.) Under § 2B1.4, the base offense level is 8 and points are then added depending on the amount of gain resulting from the offense according to the scale established in § 2B1.1.

The district court determined that the gain amount was $1,568,000. Elgindy asserts that the calculations made to reach this figure were improper and that the correct figure is $64,000. Specifically, Elgindy argues that only the gains made on four of the stocks as to which he was convicted of securities fraud involving the public market[18] should be included in the

---

[18] More precisely, these were the four stocks as to which Elgindy was convicted of securities fraud on a misappropriation and/or market manipulation theory. The fifth count of securities fraud of which he was convicted was for misleading his subscribers.

calculation (as opposed to gains on all 32 stocks as to which Elgindy acquired material nonpublic information); that the only relevant trader for the purpose of calculating profits is himself (as opposed to including AP site members as well); and that only gains made within three days from the date on which the inside information was disseminated should be included in the calculation (as opposed to gains from all trades made by relevant traders after the dissemination of the nonpublic information). The district court ultimately determined that all 32 stocks as to which Elgindy possessed misappropriated information should be considered, and that trades made by all AP site members following the dissemination of material nonpublic information should also be considered, but that the three-day period advocated by Elgindy should be applied.

In making this decision, the district court noted first that, given the fact that the insider trading scheme was clearly a joint endeavor among Elgindy and the AP site subscribers, it was appropriate to take into account the subscribers' trades. See U.S. Sentencing Guidelines Manual § 2B1.4 cmt. background (2007) ("Because the victims [of insider trading] and their losses are difficult if not impossible to identify, the gain, i.e., the total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information, is employed instead of the victims' losses." (emphasis added)). Although this meant including gains

associated with stocks with respect to which Elgindy was acquitted of securities fraud, the district court found that "clear and convincing" evidence evinced the larger pattern of trading. See United States v. Gigante, 94 F.3d 53, 55-57 (2d Cir. 1996) (holding that acquitted conduct may be considered in determining the appropriate sentence under the Sentencing Guidelines when it is established by a preponderance of the evidence). These findings of fact were not clearly erroneous.[19]

Given its determination that the appropriate gain amount was $1,568,000, and after taking into account other relevant factors (obstruction of justice, leadership, and extortion), the district court arrived at a total offense level of 31, which, given Elgindy's criminal history, translated into a Guidelines sentencing range of 135 to 168 months. The forfeiture amount of $1,568,000 (which Elgindy also challenges) was based on the same calculations, and we similarly find that the district court's determination of this amount was not erroneous.

---

[19] Elgindy points to several specific points of fact that he claims were not established by sufficient evidence to be taken into account by the district court at sentencing. But our review of the record shows otherwise. Specifically, Elgindy alleges that trades in the stock of BGI Industries ("BGII") should not have been included; but there is testimony in the record that Cleveland learned through Royer that the company was under investigation and that the information was disseminated through the AP site. He also alleges that the trading profits of three traders were improperly included in the calculation because they did not receive their information directly from Elgindy; but there was evidence that they did receive material nonpublic information that originated with Elgindy and Royer.

Elgindy also argues that there was an "unwarranted disparity" between his sentence and that of his co-conspirator, Peter Daws, who received probation and a $50,000 fine. The district court, however, specifically noted that Daws was a passive recipient of the information obtained by Elgindy and that Elgindy, unlike Daws, was convicted of extortion and of committing a crime while on pre-trial release. In light of these considerations, we do not find the disparity to be unreasonable.

Finally, Elgindy challenges the district court's determination of his sentence for making false statements to the Transportation Safety Authority and committing an offense while on bail, which were the charges contained in the second indictment (to which he pleaded guilty). He argues that the district court failed to adequately explain the basis of its sentence of 60 months for the two counts of making false statements and 27 months for the commission of an offense while released on bail. However, any error in calculating the 60 month sentence for the false statement counts was harmless, as that sentence is to be served concurrently with Elgindy's 108 month sentence for his other convictions. As to the 27-month consecutive sentence, while the district court did not parse out the steps through which it arrived at this figure, the sentence is consistent with U.S.S.G. § 3C1.3. That section provides that when 18 U.S.C. § 3147, which stipulates that a sentence for a crime committed on pretrial release shall be imposed consecutively to any other sentence imposed, applies in a given

-37-

case, the offense level for the underlying offense is increased by three levels.  The application note explains,

> the court . . . should divide the sentence on the judgment form between the sentence attributable to the underlying offense and the sentence attributable to the enhancement. The court will have to ensure that the "total punishment" . . . is in accord with the guideline range for the offense committed while on release, as adjusted by the enhancement in this section.  For example, if the applicable adjusted guideline range is 30-37 months and the court determines a "total punishment" of 36 months is appropriate, a sentence of 30 months for the underlying offense plus 6 months under 18 U.S.C. § 3147 would satisfy this requirement.

The district court appears to have done just what this note requires.  Having properly determined that the combined sentence for all the crimes of which Elgindy was convicted in both indictments was to be 135 months (the low end of the Guidelines range), it allocated that sentence between the underlying offenses and the enhancement under § 3147.  Accordingly, we decline to vacate any portion of Elgindy's sentence.

As for Royer, he challenges his sentence primarily on the ground that the gain amount applied in his case by the district court -- which was $1,568,000, the same amount applied in Elgindy's case -- was improper.  He contends that this amount includes losses related to securities fraud counts as to which he was found not guilty and that it was error to attribute acts committed by Elgindy to Royer for the purposes of sentencing because those acts were not reasonably foreseeable by him.  See United States v. Studley, 47 F.3d 569, 574 (2d Cir. 1995) (holding that in the case of jointly undertaken criminal activity, the acts of one participant may be attributed to

-38-

another for sentencing purposes  if they were reasonably foreseeable).  The district court, however, explicitly found that the nature of Elgindy's enterprise was evident to Royer from his earliest involvement in it, and given the facts in the record we find that this was not clear error.

We have considered defendants' numerous other points on appeal and find them to be entirely without merit.  Accordingly, defendants' convictions and sentences are in all respects AFFIRMED.