**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2701
_____

UNITED STATES OF AMERICA

v.

MATTHEW KLUGER,
                              Appellant
_____


On Appeal from the United States District Court
for the District of New Jersey
(D.C. Crim. No. 2-11-00858-001)
Hon. Katherine S. Hayden, District Judge
_____


Argued April 24, 2013

BEFORE: JORDAN, GREENBERG, and
NYGAARD, Circuit Judges

(Filed: July 9, 2013)
_____

Mark E. Coyne
Assistant U.S. Attorney
Caroline Sadlowski (Argued)
Assistant U.S. Attorney
Paul J. Fishman
United States Attorney
Office of the United States Attorney
970 Broad Street
Newark, NJ 07102

       Attorneys for Appellee

Harvey Weissbard (Argued)
Genova Burns Giantomasi & Webster
494 Broad Street
Newark, NJ 07102

Alan L. Zegas
Law Offices of Alan L. Zegas
522 Main Street
Chatham, NJ 07928

       Attorneys for Appellant

_____

OPINION OF THE COURT
_____

GREENBERG, <u>Circuit</u> <u>Judge</u>.

# I. INTRODUCTION

This matter comes on before this Court on an appeal from a judgment of conviction and sentence entered against appellant Matthew Kluger on June 4, 2012, in which Kluger challenges only his sentence. The government initiated this criminal case on April 5, 2011, when it filed a complaint against Kluger and Garrett Bauer in the District Court.[1] The government charged Kluger and Bauer as conspirators in a three-man insider-trading scheme in which Kenneth Robinson was the third participant. The conspiracy spanned 17 years and, so far as is known, constituted the longest such scheme in United States history.

On December 14, 2011, Kluger entered a guilty plea to a four-count information charging him with (1) conspiracy to commit securities fraud; (2) securities fraud; (3) conspiracy to commit money laundering; and (4) obstruction of justice, in violation of 18 U.S.C. § 371, 15 U.S.C. §§ 78j(b) and 78ff(a), and 17 C.F.R. § 240.10b-5; 18 U.S.C. § 1956(h), 18 U.S.C. § 1512(c)(2), and 18 U.S.C. § 2. Kluger pled guilty pursuant to a plea agreement which did not include a stipulation as to his guidelines sentencing range. On June 4, 2012, the District Court sentenced Kluger to a 60-month custodial term on Count I and 144-month custodial terms on each of Counts II, III, and IV, all four terms to be served concurrently, for a total custodial term of

---

[1] On December 8, 2011, Bauer entered a guilty plea. The District Court sentenced him on June 4, 2012, following which he filed an appeal but we have affirmed the judgment in his case. See United States v. Bauer, No. 12-2754.

144 months (12 years), a term thought to be the longest insider-trading sentence ever imposed. The sentence included a $400 special assessment, a three-year term of supervised release to follow the custodial term, and occupational restrictions relating to Kluger's employment in the securities industry.

Following a separate hearing on the same day, the District Court sentenced Bauer to a 60-month custodial term on Count I and 108-month custodial terms on each of Counts II, III, and IV, all four terms to be served concurrently, for a total custodial term of 108 months (9 years). Bauer's sentence also included a $400 special assessment, a three-year term of supervised release, and occupational restrictions.

On April 11, 2011, Robinson, the third conspirator who was the "middleman," in the insider-trading scheme because Kluger passed inside information to him and he, in turn, relayed the information to Bauer who executed the trades, pled guilty to a three-count information for securities fraud. The District Court on June 5, 2011, sentenced Robinson to concurrent 27-month custodial terms on all three counts for a total custodial term of 27 months to be followed by a three-year term of supervised release. The Court also included a $300 special assessment in Robinson's sentence. Robinson's sentence was far below his guidelines range of 70 to 87 months but the Court based it in part on a motion that the government filed pursuant to U.S.S.G. § 5K1.1 seeking a downwards departure from his guidelines sentencing range because Robinson was cooperating with the government in its investigation and prosecution of the conspiracy involved in this case. Robinson has not appealed from the sentence.

4

On June 13, 2012, Kluger filed a timely appeal, raising the following arguments. First, he challenges the District Court's calculation of his sentencing guidelines range. Second, he contends that the Court procedurally erred in imposing the sentence on him by (1) improperly denying him an evidentiary hearing prior to his sentencing; (2) failing to resolve his objections to the presentence investigation report; and (3) not ordering discovery of materials that the government turned over to the probation department for use in preparing the presentence report. Finally, he contends that the District Court imposed a procedurally and substantively unreasonable sentence.[2]

## II. BACKGROUND

The insider-trading scheme began in the summer of 1994 and, as we have indicated, involved three individuals: Kluger, Bauer, and Robinson. When the parties to the conspiracy initiated their scheme, Kluger had finished his second year of law school at New York University and was working as a summer associate at the New York law firm of Cravath, Swaine

---

[2] Kluger also argues that if we remand the case for resentencing we should direct that the case be reassigned from the original judge to a different judge but inasmuch as we are affirming the sentence the reassignment issue is moot and we do not further discuss it. Significantly, though Kluger asks that this case be reassigned on the remand he seeks he does not seek a new sentencing on the ground that the judge was biased against him.

& Moore. Kluger knew Robinson from their prior employment at a New York real estate company and Bauer knew Robinson from their prior employment at a venture capital firm in New York.[3] Although the conspirators dispute whether Kluger first approached Robinson, or vice versa, they agree that Kluger served as the sole source of the inside information involved in the conspiracy.

Beginning as a summer associate and then continuing as a full-time associate after law school, Kluger passed along material, nonpublic information concerning mergers and acquisitions to Robinson who then gave that information to Bauer, who as a professional stock trader used it to execute trades on behalf of the three conspirators.[4] Robinson instructed Bauer on how many shares to purchase for him and for Kluger, intending to keep the purchases to a modest volume to avoid drawing attention to the conspirators' activities. Nevertheless,

---

[3] In his sentencing memorandum in the District Court, Bauer explained that he "met Matt [Kluger] only once long before the conspiracy started, and recalls speaking with him on the telephone only briefly on perhaps one occasion during the 17-year period of the conspiracy."

[4] The law firms employing Kluger gave him training concerning inside trading and repeatedly required him to sign internal law firm policy statements prohibiting him from engaging in such trading. There is no suggestion in the record that any attorney or employee of any of the firms that employed Kluger other than Kluger himself was involved in the inside trading.

Bauer deviated from Robinson's instructions by trading in share volumes far in excess of the number of shares that the three conspirators agreed would be traded.[5] This excess trading, though originally greatly enhancing Bauer's trading profits, likely was a catastrophic mistake as it well may have triggered the investigation into the conspirators' activities. Neither Bauer nor Robinson informed Kluger of the extent of Bauer's trading. In executing his trades, Bauer followed the practice of purchasing the shares based on Kluger's information before the information became public and then selling the shares after the announcement. Following successful trades, Bauer would make withdrawals from multiple ATM machines and then give Robinson cash, minus capital gains taxes, to cover the payments to Robinson and Kluger.[6]

The first phase of the scheme continued through 2002 and involved inside information related to approximately 20 corporate transactions resulting in profits of $13,026,904. During that period, Kluger moved from one law firm to the next. Thus, following his employment at Cravath, Swaine & Moore,

---

[5] There is some dispute as to the existence and terms of the agreement but on this appeal we accept Kluger's contention that Bauer greatly exceeded the limitations on which the conspirators agreed with respect to the number of shares that would be traded.

[6] We are not suggesting that Kluger did not receive taxable income on the money paid to him merely because Bauer may have paid taxes on all of the conspirators' gains as that issue is not before us.

Kluger obtained a position with Skadden, Arps, Slate, Meagher & Flom which employed him for approximately three years in its New York and Palo Alto offices. Thereafter Fried, Frank, Harris, Shriver & Jacobson employed Kluger for approximately one year in its New York office. In the late 1990s, the Securities and Exchange Commission began investigating some of the conspirators' trades. By 2002, the scheme went on hiatus while Kluger worked for Sills, Cummis, Epstein & Gross and then served as an in-house counsel for a corporation, two places of employment at which Bauer did not gain information useful for inside trading. The second phase of the scheme started when Kluger joined the Washington, D.C. office of Wilson, Sonsini, Goodrich & Rosati as a senior associate in December 2005 and this phase continued throughout his tenure at that firm for more than five years. Although in some cases the insider trading led to losses, overall the insider-trading scheme made substantial profits.[7]

During the second phase of the insider-trading scheme, Kluger provided inside information regarding 13 transactions. Presentence Report ("PSR") ¶ 49. Relying on that information, Bauer wagered approximately $124 million through his trading accounts and realized $34,465,343 in gross profits. Id. ¶ 98. The insider-trading profits allowed Bauer to purchase a $6.65 million apartment in Manhattan and an $875,000 home in

---

[7] The presentence report describes Cravath, Swaine & Moore, Skadden, Arps, Slate, Meagher & Flom, Fried, Frank, Harris, Shriver & Jacobson, and Wilson, Sonsini, Goodrich & Rosati as "four of the largest and most prominent mergers and acquisition law firms in the United States." PSR ¶ 13.

Florida.  Id. ¶ 88.  The conspirators took extra precautions during the second phase of the scheme to avoid detection, especially when they learned in or around 2007 that their trading activities had come to the attention of civil regulators.  Kluger, for example, only misused information related to transactions on which he was not working during his employment at Wilson, Sonsini, Goodrich & Rosati.  Moreover, the conspirators started to use pay phones and "throwaway" prepaid cellular phones for their communications and Robinson kept some of the illicit cash in safe deposit boxes.  In spite of the conspirators' steps to avoid detection, their activities were uncovered and FBI and IRS agents executed a search warrant at Robinson's home on March 8, 2011, in furtherance of the investigation.  Id. ¶ 53.  The agents inquired about the suspicious trades in his and Bauer's accounts as well as Robinson's "structuring" activities by making deposits under the $10,000 mandatory reporting threshold.

Following the execution of the warrant, Robinson called Bauer and Kluger separately to inform them of the search and ongoing investigation.  In the following weeks, unbeknownst to Bauer and Kluger, Robinson began cooperating with the government and recording his separate phone conversations with them.  The incriminating conversations not only implicated the parties based on their past conduct but also revealed their plans to obstruct justice by destroying key evidence, such as cell phones and computers, and by agreeing not to cooperate with the government.  A bizarre example of their attempts to obstruct justice was Bauer's proposal that Robinson burn $175,000 in cash obtained in the latest ATM withdrawals to eliminate Bauer's fingerprints, or, alternatively, to run the cash through a washing machine, a suggestion that gives a new and literal

meaning to the term "money laundering."

During this cover-up phase of the conspiracy, Kluger emphasized that he was not going to cooperate with the government because he knew he never would get a good deal due to his role as the source of the inside information. On April 6, 2011, federal agents arrested Bauer and Kluger. Five days later, federal agents arrested Robinson, who pled guilty that same day.

## III. JURISDICTION

The District Court exercised jurisdiction pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 18 U.S.C. § 3742(a)(1) and 28 U.S.C. § 1291.

## IV. DISCUSSION

A. **Sentencing**

### 1. Sentencing Guidelines Calculation

On appeal, "[w]e review the District Court's interpretation of the Sentencing Guidelines de novo, and scrutinize any findings of fact for clear error." United States v. Aquino, 555 F.3d 124, 127 (3d Cir. 2009) (internal citations omitted). But "[w]e review the District Court's application of the Guidelines to facts for abuse of discretion." United States v.

10

Tupone, 442 F.3d 145, 149 (3d Cir. 2006) (citation omitted); see also Aquino, 555 F.3d at 127 n.5 ("[T]he appropriate standard when reviewing a district court's application of law to fact is due deference.") (citation and internal quotation marks omitted).

The first step of the three-step sentencing process requires a district court to calculate a defendant's guidelines sentencing range in the same way that it would have made its calculations prior to the Supreme Court's decision in United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005), in which the Court determined that the guidelines would have only an advisory status. See United States v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006). Kluger argues that the District Court improperly used U.S.S.G. § 2B1.4 ("Insider Trading") exclusively for calculating the gain attributable to him for the purposes of sentencing, thereby ignoring U.S.S.G. § 1B1.3 ("Relevant Conduct"). Under § 2B1.4, the District Court attributed all of the scheme's monetary gain to Kluger even though his share of the profits was far less than Bauer's share when Bauer was trading on Kluger's information.[8] Of course, the attribution of gains to a defendant can be critical in a guidelines sentencing range calculation for in general, within ranges of gains, the larger the gain attributable to a defendant the higher his sentencing range will be.

---

[8] The District Court also attributed Robinson's trading gains to Kluger, but these gains were minimal in comparison to Bauer's gains. The fact that profits are attributable to one conspirator in guidelines calculations does not mean that the same gains cannot be attributed to another conspirator as well.

11

We interpret and apply the guidelines as written. <u>See</u> <u>United States v. Wong</u>, 3 F.3d 667, 670 (3d Cir. 1993) (citation omitted). Therefore, "[a]s with statutory language, the plain and unambiguous language of the Sentencing Guidelines affords the best recourse[9] for their proper interpretation." <u>Id.</u> (citations omitted). The Supreme Court has explained "that commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."[10] <u>Stinson v. United States</u>, 508 U.S. 36, 38, 113 S.Ct. 1913, 1915 (1993). With those holdings in mind, we examine the guidelines text and applicable commentary.[11]

---

[9] The word "recourse" appears in the original opinion. We believe that the Court may have intended to say "resource."

[10] In <u>Stinson v. United States</u> the Supreme Court explained that the commentary not only clarifies the guidelines but also "provides concrete guidance as to how even unambiguous guidelines are to be applied in practice." 508 U.S. 36, 44, 113 S.Ct. 1913, 1918 (1993). Though the guidelines are no longer mandatory, we still look to the commentary when we calculate the guideline sentence as we would have pre-<u>Booker</u>.

[11] The District Court used the November 1, 2011 edition of the <u>Guidelines</u> <u>Manual</u> in Kluger's sentencing as that edition was in effect at the time of the sentencing and there were no ex-post facto concerns in this case by reason of amendment of the guidelines after Kluger committed his offenses barring the use of that edition. Therefore, the Supreme Court's recent holding

12

As applicable in this case the insider-trading guideline, U.S.S.G. § 2B1.4, states:

(a) Base Offense Level: 8

(b) Specific Offense Characteristics

(1) If the gain resulting from the offense exceeded $5,000, increase by the number of levels from the

---

in Peugh v. United States, 569 U.S. ____, 133 S.Ct. 2072 (2013), prohibiting as a violation of the Constitution's ex post facto clause the sentencing of a defendant under a guideline promulgated after the commission of the crime and recommending a higher sentencing range than the applicable guideline at the time of the crime, is inapplicable. Nonetheless, we note that following the passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, the guidelines were amended to provide: "If the offense involved an organized scheme to engage in insider trading and the offense level determined above is less than level 14, increase to level 14." U.S.S.G. § 2B1.4(b)(2). This guideline sentencing range increase reflects a continued push to ratchet up the penalties for insider trading. The application note applying subsection (b)(2) states: "[A]n 'organized scheme to engage in insider trading' means a scheme to engage in insider trading that involves considered, calculated, systematic, or repeated efforts to obtain and trade on inside information, as distinguished from fortuitous or opportunistic instances of insider trading." U.S.S.G. § 2B1.4 cmt. n.1.

13

table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

. . .

The commentary's application note 2 reads:

Application of § 3B1.3.--Section 3B1.3 (Abuse of Position of Trust or Use of Special Skill) should be applied if the defendant occupied and abused a position of special trust. Examples might include . . . an attorney who misused information regarding a planned but unannounced takeover attempt.

U.S.S.G. § 2B1.4 cmt. n.2.

The commentary's background reads:

. . . Insider trading is treated essentially as a sophisticated fraud. Because the victims and their losses are difficult if not impossible to identify, the gain, i.e., the total increase in value realized through trading in securities by the defendant and <u>persons acting in concert with the defendant or to whom the defendant provided inside information</u>, is employed instead of the victims' losses.

U.S.S.G. § 2B1.4 cmt. background (emphasis added).

The government relies on the commentary's plain language to support its argument that in a guidelines calculation Bauer's gains even when not shared with Kluger are attributable to Kluger. In this regard it is significant that Kluger does not

14

dispute either his role as the source of the information on which Bauer traded or the amount of Bauer's gains based on that information. Rather, he counters that there is no support in the § 2B1.4 commentary for a conclusion that the "gain" calculation is exempted from the application of the reasonable foreseeability test under § 1B1.3(a)(1)(B) and that the District Court should have applied § 1B1.3(a)(1)(B) to lessen the gains of the conspiracy attributable to Kluger.

U.S.S.G. § 1B1.3 states:

(a) Chapters Two (Offense Conduct) and Three (Adjustments). <u>Unless otherwise specified</u>, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all <u>reasonably foreseeable</u> acts and omissions of others in furtherance of the jointly undertaken criminal activity,

15

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense; . . . .

U.S.S.G. § 1B1.3 (emphasis added). According to Kluger, the § 2B1.4 commentary dealing with insider trading merely provides an overview of the importance of gain in the context of insider trading; it does not trigger the "[u]nless otherwise specified" exception to the application of § 1B1.3, a guidelines section that standing alone arguably could have resulted in Kluger having a lower offense level and thus a lower sentencing range than the range that the District Court applied in his sentencing.[12] Therefore, Kluger argues that the Court erred in not holding a presentence evidentiary hearing to determine whether he reasonably could have foreseen that Bauer would engage in his outsized trades inasmuch as he did not agree to the scale of those trades.

In United States v. Cespedes we explained that "[b]y including the phrase 'unless otherwise specified,' the relevant conduct provision admits of exceptions to application of § 1B1.3(a)(1)(B)'s reasonable foreseeability test in certain instances." 663 F.3d 685, 689 (3d Cir. 2011). Cespedes, a case involving a prosecution following a three-man armed bank

---

[12] As we explain below even if we applied the foreseeability test as Kluger urges our result might be the same as that which we reach.

16

robbery, dealt with the application of an enhancement in U.S.S.G. § 3C1.2 for "recklessly creating a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." 663 F.3d at 686-87. Cespedes and Grant, two of the three conspirators, who were armed entered a bank while the third conspirator, Whitehurst, waited outside in a getaway car. Cespedes flashed his weapon, and he and Grant removed the cash stolen in the robbery before exiting the bank and jumping into the car. After Whitehurst drove from the bank the police attempted to make a traffic stop of the getaway car and a high-speed chase through residential neighborhoods ensued. At some point, Cespedes and Grant jumped out of the car and fled on foot. Whitehurst, however, continued on driving recklessly, nearly striking pedestrians before eventually hitting a parked minivan and then colliding with a police vehicle. See id. at 687.

The applicable commentary to the sentencing enhancement explained that "the defendant is accountable for the defendant's own conduct and for conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused." Id. at 689 (citing U.S.S.G. § 3C1.2 cmt. n.5). In overturning the district court's application of the enhancement, we explained that by "specifically describing" when the enhancement was applicable the guidelines based the enhancement on "something other than reasonable foreseeability," and therefore created an exception to the application of § 1B1.3(a)(1)(B)'s reasonable foreseeability test. Accordingly, the application of a reasonable foreseeability test impermissibly expanded the scope of the criminal acts attributable to Cespedes in direct contravention of the

17

commentary to the enhancement guideline.

Kluger's case differs from Cespedes' because the application of the reasonable foreseeability test arguably impermissibly would constrict rather than expand Kluger's responsibility in possible contravention of the commentary to the insider-trading guideline.  But the key is not the distinction between expansion and constriction of responsibility but rather the application of the relevant commentary.  The plain language of the commentary's background to § 2B1.4 unequivocally attributes all of Bauer's gains to Kluger because Bauer was a "person[] acting in concert with the defendant," as well as one "to whom the defendant provided inside information." U.S.S.G. § 2B1.4 cmt. background.   Therefore, the insider-trading guideline falls under the "unless otherwise specified" exception of § 1B1.3, and, as a result, we will not use the reasonable foreseeability test in reviewing the District Court's calculation of the offense level and thus of the guidelines range in imposing a sentence on Kluger.[13]

---

[13] We are not suggesting that if we applied a reasonable foreseeability test to Kluger's conduct under U.S.S.G. § 1B1.3(a)(1)(B), we would not hold him responsible for the profits that Bauer obtained.  Rather, we do not pass on this question.  Nevertheless, we observe that it is undisputed that Kluger passed inside information to Robinson with the intent that the information would reach Bauer who Kluger knew was a securities trader in order for Bauer to place illicit trades.  The District Court believed based on the facts in the record, including the logistics of the scheme and the taped conversations

The accompanying guideline to § 2B1.4, § 2B1.1 ("Larceny, Embezzlement, and Other Forms of Theft") supports our result. Section 2B1.1 includes a glossary of definitions one of which, "Actual Loss," "means the reasonably foreseeable pecuniary harm that resulted from the offense" and "Reasonably Foreseeable Pecuniary Harm," which "means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1 cmt. n.3. The presence of this foreseeability language in § 2B1.1 demonstrates that the Sentencing Commission could have inserted an explicit foreseeability requirement in § 2B1.4 if it had wanted to do so.[14] In the

---

prior to Kluger's arrest, that it was reasonably foreseeable to him that Bauer would trade above and beyond any initially agreed on limit, assuming that an agreement limiting the number of shares to be traded was in place.

[14] If Kluger had engaged in the commission of financial fraud other than insider trading, and the District Court had used § 2B1.1 instead of § 2B1.4 in making its calculations, the § 1B1.3 reasonable foreseeability provision might have been applicable in his sentencing. In a recent decision by the Court of Appeals for the Tenth Circuit involving a pump-and-dump scheme, the court affirmed the attribution of the conspirators' profits after holding that the profits were reasonably foreseeable to the defendant. See United States v. Gordon, 710 F.3d 1124, 1164 (10th Cir. 2013) ("As long as the gain of a co-conspirator is reasonably foreseeable, it can be attributed to a defendant.") (citation omitted). We, however, do not make a determination on that point because we are not dealing with a situation parallel

19

circumstances we should not look beyond the plain language of § 2B1.4 and read a foreseeability test into § 2B1.4.

In reaching our result, we are aware of certain widely publicized recent cases from other courts dealing with insider-trading convictions that the parties on this appeal discuss in their briefs. In United States v. Gupta the district court strictly relied on § 2B1.4 and its commentary for calculating gain in an insider-trading case even though the court believed that the guideline "'is not a model of clarity.'" 904 F. Supp. 2d 349, 352 (S.D.N.Y. 2012) (citing United States v. Rajaratnam, No. 09 Cr. 1184, 2012 WL 362031, at *14 (S.D.N.Y. Jan. 31, 2012), aff'd, No. 11-4416-cr, 2013 WL 3155848, ____ F.3d ____ (2d Cir. June 24, 2013)).[15] In that case Rajat Gupta, a former Goldman

to that in Gordon.

[15] Our internal operating procedures provide that our not precedential opinions are not binding on panels in later cases in this Court. See Chehazeh v. Attorney Gen., 666 F.3d 118, 127 n.12 (3d Cir. 2012) (citing Internal Operating Procedures 5.7 (3d Cir. 2010)). Consequently, we surely are not bound by unpublished district court opinions from courts in other circuits. But the parties have discussed Gupta and Rajaratnam and we do not think that we simply should ignore these cases. Furthermore, we find these insider-trading sentencing decisions from the Southern District of New York informative and persuasive and consider them in our discussion of the interpretation of the sentencing guidelines even though the parties only cite to them in their discussion of the "disparity" of defendants' sentences in insider-trading cases and the

Sachs director, was convicted of one count of conspiracy and three counts of securities fraud for providing material, nonpublic information to an investor, Raj Rajaratnam, the founder and head of the hedge fund Galleon Group. The jury found that Gupta tipped Rajaratnam ahead of Warren Buffett's $5 billion infusion into Goldman Sachs and tipped him again in advance of Goldman's unexpected announcement of quarterly losses in 2008. Galleon's trades based on those tips led to an illicit "gain" of $5,032,195. See Gupta, 904 F. Supp. 2d at 353. In calculating Gupta's guideline range, the district court did not assess the extent to which the $5,032,195 figure was foreseeable to Gupta.[16] In fact, the district court did not make any reference to foreseeability under § 1B1.3 even though Gupta, like Kluger, was a tipper.[17]

---

application of the sentencing considerations set forth in 18 U.S.C. § 3553(a).

[16] Although the district court in Gupta granted a § 3553(a) variance based in part on the fact that Gupta did not derive any monetary gain from the information that he provided, the variance was an individualized decision that has no bearing on the underlying guidelines calculation for other defendants.

[17] In United States v. Royer the Court of Appeals for the Second Circuit applied a reasonable foreseeability test to a tipper in an insider-trading case. 549 F.3d 886 (2d Cir. 2008). The appeals court affirmed the district court's sentence predicated in part on the attribution to the appellant tipper of the acts of another defendant, the tippee, on the grounds "that the nature of [the

In Rajaratnam, the district court also relied on the commentary to U.S.S.G. § 2B1.4 to calculate gain without addressing the foreseeability issue addressed in § 1B1.3. See Rajaratnam, 2012 WL 362031.[18]  A jury convicted Rajaratnam

tippee's] enterprise was evident to [the tipper] from his earliest involvement in it." Id. at 905.  Yet in Royer the gain calculation included trades stemming from securities fraud counts of which the tipper and tippee were acquitted.  And when the tippee became the tipper by providing insider information that he initially received to paying subscribers via his website, he was held responsible for their gains without any reference to reasonable foreseeability.  The court included the subscribers' trades in its calculation based on § 2B1.4's background commentary.  See id. at 904 ("'Because the victims [of insider trading] and their losses are difficult if not impossible to identify, the gain, i.e., the total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information, is employed instead of the victims' losses.'") (alteration and emphasis added in original) (citing U.S.S.G. § 2B1.4 cmt. background).

[18] We reiterate that unpublished opinions are not binding on this Court, but we find the opinions we cite to be persuasive in our analysis in this case.  Furthermore, it is certainly appropriate to cite them in our disparity discussion as Kluger advances them in support of his appeal.  We also are aware that both Gupta and Rajaratnam have been appealed and that the Court of Appeals for the Second Circuit has affirmed the conviction in Rajaratnam without addressing sentencing issues as the

22

on 14 counts of insider-trading crimes involving trades by Galleon. Rajaratnam used inside information gathered from a number of sources to execute trades in publicly traded companies including Intel, Google, and Goldman Sachs. As the tippee, Rajaratnam was not in a position parallel to that of Kluger. Moreover, Rajaratnam occupied an unusual position as both a Galleon partner entitled to management fees and an investor entitled to a percentage of the gains. Nonetheless, without any reference to foreseeability, the court explained in its detailed analysis of U.S.S.G. § 2B1.4 that the correct interpretation of the background commentary "include[s] gains from trading by 'persons . . . to whom the defendant provided inside information' and thereby hold[s] tippers responsible for gains by their tippees." Id. at *15 (citing U.S.S.G. § 2B1.4 cmt. background).

We agree with Rajaratnam and hold that the plain language of the background commentary to § 2B1.4 clearly indicates that Kluger can be held responsible for the full extent of Bauer's gains. Bauer is explicitly an individual "to whom the defendant provided inside information."[19] U.S.S.G. § 2B1.4

_____

appellant in that case did not challenge his sentence on the appeal.

[19] We are not concerned with the fact that Kluger directly provided the information to Robinson, who then provided the information to Bauer. Kluger intended Bauer to be the ultimate tippee because Kluger knew that Robinson would not exercise the vast majority of the trades on behalf of the conspirators.

23

cmt. background. Therefore, Bauer's gains should be attributed to Kluger in their entirety, and the District Court needed to go no further in its calculations of the gain attributable to Kluger under § 2B1.4.[20]

Finally with respect to guidelines calculations, we note that we do not share the policy concerns that Kluger advances that a "sentence [of] an individual for unforeseeable conduct by a co-conspirator [] accomplish[es] no recognized penological aim." Appellant's br. at 30. By punishing the conspirator who is the source of the information for all gains made by his co-conspirators, we are reinforcing the deterrence message sent to would-be tippers by many courts. Moreover, we are sending a clear warning to individuals, such as Kluger, who, in an attempt to limit their responsibility and the extent of their potential sentencing exposure allege that they had agreements with their co-conspirators to cap the illicit gains. Would-be tippers will know that they cannot be certain that they will restrict their responsibility by coming to limiting agreements with their co-conspirators prior to commission of their offenses and will come to realize the inherent risk in leaking inside information. We also point out that both what we recognize was a long sentence that the Court imposed on Kluger and this opinion are likely to come to the attention of would-be insider traders who may be better educated and informed than persons engaging in other criminal activity, particularly inasmuch as insider-trading cases seem to be well publicized even in the general media.

---

[20] We also note that we are not faced with and therefore leave to another day whether this rationale applies outside the criminal context.

24

**2. Hearing, Objections and Discovery**

When reviewing a district court's interpretation of the sentencing guidelines we exercise plenary review, but when reviewing a district court's application of the guidelines to the facts, we utilize an abuse of discretion deferential standard of review. See Aquino, 555 F.3d at 127 n.5. Kluger argues that the District Court denied him a presentence evidentiary hearing at which he could have addressed the foreseeability issue with respect to the scope of the agreement among the conspirators through direct testimony and cross-examination.[21] At sentencing, Kluger explained that he did not stipulate to the total amount of "gain" because he expected to address that issue at the hearing that he contemplated the Court would conduct prior to his sentencing. Kluger also argues that the Court failed to resolve his objections to the presentence report and also erred in not ordering discovery regarding information the government provided to the probation officer. In particular, Kluger objected to the presentence report's characterization of the agreement among the conspirators and the portrayal of Kluger as the initiator of the conspiracy.

Under U.S.S.G. § 6A1.3(a) (emphasis added):

---

[21] We review a refusal to grant such an evidentiary hearing for abuse of discretion. See United States v. Cantero, 995 F.2d 1407, 1412 (7th Cir. 1993) (citations omitted). The government put Robinson, the "middleman," on notice that he might need to testify at Kluger's sentencing hearing, but the District Court determined that this testimony was not necessary because the Court did not conduct an evidentiary hearing.

When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, <u>provided that the information has sufficient indicia of reliability to support its probable accuracy</u>.

U.S.S.G. § 6A1.3(b) provides that, "[t]he court shall resolve disputed sentencing factors at a sentencing hearing in accordance with Rule 32(i), Fed. R. Crim. P." Rule 32(i) (emphasis added) provides that at sentencing, the court:

(A) must verify that the defendant and the defendant's attorney have read and discussed the presentence report and any addendum to the report;

. . .

(C) must allow the parties' attorneys to comment on the probation officer's determinations and other matters relating to an appropriate sentence; and

. . .

(2) The court <u>may</u> permit the parties to introduce evidence on the objections. . . .

(3) At sentencing, the court:

. . .

(B) must--for any disputed portion of the presentence report or other controverted matter--rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing . . . .

### a. Evidentiary Hearing

The District Court held an extensive sentencing hearing for Kluger in which the parties addressed the Court. The sentencing guidelines and Federal Rules of Criminal Procedure do not require that a district court conduct an evidentiary hearing in addition to a sentencing hearing at which the parties can be heard. Thus, "[a]n evidentiary hearing need not be afforded on demand because there is no 'right' to a hearing." United States v. Cantero, 995 F.2d 1407, 1413 (7th Cir. 1993) (citations omitted); see also United States v. Real-Hernandez, 90 F.3d 356, 362 (9th Cir. 1996) ("There is no general right to an evidentiary hearing at sentencing, and a district court has discretion to determine whether to hold such a hearing.") (internal citations omitted). In Cantero the Court of Appeals for the Seventh Circuit held that the district court did not abuse its discretion in denying the defendant in a drug conspiracy case an evidentiary hearing to contest the sentencing enhancement for his supervisory role in the conspiracy, even though the defendant argued that the determination of his role in the conspiracy raised a question of fact and that he needed to cross-examine his co-conspirators so that the court could determine how to characterize his role. In this regard, the defendant was given a

27

copy of the presentence report in advance of sentencing and the government and he submitted written memoranda on the issue. See Cantero, 995 F.2d at 1413. The district court, after considering the materials submitted on the issue, held that the defendant was not a leader or organizer of the criminal activity but rather was a manager or supervisor of the activity.

In United States v. Collado, a case involving two brothers serving as heroin suppliers in a broader drug conspiracy, we remanded the case for resentencing because the district court failed to make any factual findings beyond those in the presentence report concerning the scope of their involvement. 975 F.2d 985 (3d Cir. 1992). We emphasized that when a district court is applying § 1B1.3 "a searching and individualized inquiry into the circumstances surrounding each defendant's involvement in the conspiracy is critical to ensure that the defendant's sentence accurately reflects his or her role." Id. at 995. But in Collado the record was unclear as to when the brothers initially became involved in the conspiracy, and therefore the record did not clearly establish the date after which the brothers could be held accountable for the proceeds of the conspiracy. See id. at 996. There is, however, no uncertainty as to the time during which Kluger participated in the conspiracy in this case because the conspiracy could not have been carried out prior to his involvement inasmuch as he served as the source of the information that made the execution of the scheme possible.

In United States v. Rennert, building on Collado, we clarified that "[a]lthough we required individualized inquiry [in Collado], we did not impose an immutable requirement that the district court hold extensive hearings to make explicit,

28

particularized findings as to the exact date on which each defendant committed to the conspiracy or the precise contours of each conspirator's agreement." 374 F.3d 206, 214 (3d Cir. 2004), vacated in part on other grounds, Miller v. United States, 544 U.S. 958, 125 S.Ct. 1744 (2005). Consequently, we agree with the Court of Appeals for the Seventh Circuit "that § 6A1.3 of the Guidelines requires the district court to provide a procedure — but not necessarily an evidentiary hearing — in which the parties may argue contested sentencing issues." Cantero, 995 F.2d at 1413 (citation omitted); see also Fed. R. Crim. P. 32(i)(2) ("The court may permit the parties to introduce evidence on the objections.") (emphasis added). Here, the extensive sentencing hearing before the District Court gave Kluger a sufficient opportunity to present his case.

In holding Kluger responsible for the profits from the insider trading under the plain language of § 2B1.4 in which foreseeability as Kluger raises the issue in this case is not an issue, we agree with the District Court that there was no need for an evidentiary hearing. Kluger does not dispute the total amount gained by Bauer on which the District Court made its calculations and he does not deny that his tips to Bauer via Robinson made the gains possible. No matter what the terms of the agreement among the conspirators, those terms would not have altered the fact that Kluger provided the information that reached Bauer via Robinson and made it possible for Bauer to make substantial gains by trading on that information. Furthermore, even if the foreseeability to Kluger of the extent of Bauer's trades had been an issue in Kluger's sentencing, as he claims it should have been, as the District Court explained, Kluger could not have "made one of his regular trips north to

29

pick up his cash proceeds, [and then] return[ed] back resting comfortably in the idea that nobody else had a dollar more than he did of gain." App. at 63.

### b. Objections

In a May 25, 2012 letter to the District Court, Kluger complained that the presentence report did not adequately address his objections. As noted above, Kluger objected to the characterization of the scheme, which he alleged was based on an underlying agreement regarding the division and targeted range of profits, thereby altering the calculation of the gains attributable to him and explaining the absence of a loss stipulation in the plea agreement. Kluger also objected to the presentence report's description of him as the initiator of the scheme, a characterization that he would have attempted to rebut in testimony at a presentence evidentiary hearing. The presentence report read:

> In the summer of 1994, Kluger, who was then in law school at NYU and working as a summer associate at Cravath [,Swaine & Moore], contacted Robinson and told him 'I've got something,' meaning that he had access to inside information through his employment at the law firm. Kluger explained that he could learn of merger activity before the information was public through his work at the firm. At Kluger's request, Robinson agreed to help find individuals willing to buy and sell stocks based on the inside information Kluger provided. Robinson

30

approached Bauer, a professional stock trader and Robinson's friend, who agreed to trade based on the inside information provided by Kluger.

PSR ¶ 34. Kluger, however, proposed the following paragraph:

Kluger and Robinson remained friends after their brief stint working together at the Manhattan real estate company, REQuest, and would speak on the phone from time to time. In the summer of 1994, Kluger was in law school at NYU and working as a summer associate at Cravath, Swaine & Moore. In several telephone conversations in which Kluger and Robinson discussed each other's work and current lives, Robinson became aware that Kluger was working on potentially high profile [merger and acquisition] deals and that he was learning of merger activity before the information became public through his work at the firm. Robinson then told Kluger about his friend Garrett Bauer, a professional stock trader and Robinson's friend. Robinson approached Bauer who agreed to trade based on the inside information provided by Kluger. Kluger, Bauer and Robinson agreed that profits from any inside information provided by Kluger would be split equally among the three of them. From the beginning of the scheme, Bauer did not honor his agreement to split profits equally among the three participants and, instead, kept the majority of the profits for himself.

31

> Kluger was unaware that Bauer was trading over and above the amounts discussed between Kluger and Robinson.

PSR ¶ 57.

The Probation Department, however, is not required to resolve all objections. Following Fed. R. Crim. P. 32(g), the probation officer "submit[ted] to the court and to the parties the presentence report and an addendum containing any unresolved objections, the grounds for those objections, and the probation officer's comments on them." Fed. R. Crim. P. 32(g).

In considering the presentence report the District Court complied with the applicable federal rules of criminal procedure. Fed. R. Crim. P. 32(i)(3)(B) provides that the sentencing court "must--for any disputed portion of the presentence report or other controverted matter--rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing . . . ." The District Court made its disposition with respect to the dispute concerning the existence of a limiting agreement among the conspirators by refusing to grant a hearing on the grounds that Kluger could not prove anything at the hearing that would impact on the Court's determination of his sentence. The Court reached its conclusion as to how to proceed by relying on the plain language of § 2B1.4 and by taking into account its concern over the potential for unreliable testimony regarding the agreement. At the sentencing hearing, the Court explained that it was "fully satisfied that the background note to the insider trading . . . guideline[] fully covers Mr. Bauer's

activities and Mr. Kluger's activities. And that the gain attributable to Bauer's activities is attributable to Kluger in terms of the exposure to the guideline," regardless of the existence of an agreement. App. at 63.

Clearly, in Kluger's proposed changes to the presentence report quoted above he attempts to describe his role in the scheme in more benign terms than the report described his role. Thus, Kluger suggests that the presentence report should have recited that "Robinson became aware," of Kluger's access to inside information whereas the report states that Kluger directly contacted Robinson and informed him that he had access to inside information. The presentence report also states that Kluger asked Robinson to locate an individual capable of executing the trades on their behalf whereas Kluger claims that Robinson told him about Bauer and approached Bauer on his own.

Kluger concedes that he did not object to the presentence report at sentencing but attributes his failure to object to his expectation that the Court would resolve factual disputes at the evidentiary hearing that he contemplated that the Court would hold before imposing sentence. Kluger argues that even though the District Court did not directly address his alleged initiating role in the scheme, the Court could not have failed to consider it. Kluger, however, is in no position to make assumptions as to what the District Court did or did not take into consideration in rendering its sentence. Ultimately, Kluger was the source of the information that Bauer used to make his trades; the identification of the originator of the underlying scheme was of minimal significance in view of the circumstance that Kluger

33

was a full participant in the conspiracy, and therefore an inquiry into the originator of the scheme did not merit an individualized sentencing hearing.

### c. Discovery

Kluger claims that there are materials, including recorded conversations and emails, that would prove that there was an agreement among the three conspirators regarding the limits of the insider-trading scheme.[22] He maintains that the government violated his due process rights by not supplying to him all of the materials that it provided to the probation office which he argues functions as "an independent arm of the court," not as "an arm of the government." Appellant's br. at 57. But Fed. R. Crim. P. 32, which deals with presentence reports does not provide for such broad discovery with respect to presentence materials. Rather, Rule 32(e)(2), requires that the probation officer give the report itself to the defendant, the defendant's counsel, and a government attorney at least 35 days prior to sentencing unless the defendant waives the time requirement. Rule 32(f) provides that the parties have 14 days to object in writing and to provide

---

[22] In particular, Kluger maintains that he should have received tapes/transcripts of Robinson's post-arrest conversations with Bauer. We believe he is referring to the conversations between Robinson and Bauer following Robinson's decision to cooperate with the government. The presentence report provides a detailed overview of those conversations. We are not aware of any communications between Bauer and Robinson after their arrests on the charges involved in this case.

those objections to the probation officer and to the opposing party.  The probation officer then may meet with the parties to review their objections.  See Rule 32(f)(3).  At least seven days before sentencing, the probation officer must provide the report and related objections to the court and parties.[23]  See Rule 32(g).  Thus, Rule 32 did not require that Kluger be given the discovery that he sought.

In any event, even if the rules provided that such discovery materials should have been supplied, Kluger does nothing more than speculate with respect to the existence of such materials, especially in the absence of any indication that the government failed to comply with the rule's disclosure requirements that should be made.  The government counters that it already disclosed all of the information, such as the transcripts and copies of the calls that Robinson covertly recorded, and, at sentencing, the District Court accepted the

---

[23] The only additional disclosure occurs at sentencing when the court "must give to the defendant and an attorney for the government a written summary of--or summarize in camera--any information excluded from the presentence report under Rule 32(d)(3) on which the court will rely in sentencing, and give them a reasonable opportunity to comment on that information."  Fed. R. Crim. P. 32(i).  Rule 32(d)(3) requires the presentence report to exclude: "(A) any diagnoses that, if disclosed, might seriously disrupt a rehabilitation program; (B) any sources of information obtained upon a promise of confidentiality; and (C) any other information that, if disclosed, might result in physical or other harm to the defendant or others."

government's assertion.[24]

### 3. Reasonableness

We review the procedural and substantive reasonableness of the sentence for abuse of discretion. See United States v. Friedman, 658 F.3d 342, 360 (3d Cir. 2011) (citation omitted). "At both [the procedural and substantive] stages of our review, the party challenging the sentence has the burden of demonstrating unreasonableness." United States v. Tomko, 562 F.3d 558, 567 (3d Cir. 2009) (en banc) (citation omitted)).

### a. Procedural Reasonableness

In the wake of United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, we have instructed district courts to adhere to a three-step sentencing process. See Gunter, 462 F.3d at 247. First, the district "[c]ourts must continue to calculate a

---

[24] The government indicates in its brief that the only information that it provided to the probation office that it did not provide to Kluger were copies of his personnel files from his employment at the law firms where he obtained inside information. These files provided the support for the parts of the presentence report outlining the dates of his employment, his salary, and the training he received. But the government contends that Kluger had independent access to these files. Moreover, with or without such access to the files Kluger surely had the information that the files contained with respect to his salary, training, and dates of employment and he knew that the firms gave him instructions with respect to insider trading.

defendant's Guidelines sentence precisely as they would have before Booker." United States v. Brown, 578 F.3d 221, 225 (3d Cir. 2009) (footnote, internal quotation marks, and citations omitted). Second, "they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-Booker case law, which continues to have advisory force." Id. (internal quotation marks and citations omitted). Third, the district courts "are to exercise their discretion by considering the relevant § 3553(a) factors . . . in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines." Id. (internal quotation marks and citations omitted). In order to satisfy step three, "[t]he record must disclose meaningful consideration of the relevant statutory factors and the exercise of independent judgment, based on a weighing of the relevant factors, in arriving at a final sentence." United States v. Grier, 475 F.3d 556, 571-72 (3d Cir. 2007) (citation omitted). In accordance with Gunter, the District Court calculated that Kluger had an adjusted offense level of 33 and a sentencing range of 135-168 months. After reviewing the applicable § 3553(a) factors, the District Court sentenced Kluger to a custodial term of 144 months, in the middle of his guidelines range.

We focus our review on Kluger's challenge to the District Court's application of step three of the sentencing process. Under 18 U.S.C. § 3553(a), the district court should impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes discussed in the second criterion below. In particular, the court should consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed--

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for--

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

. . .

(5) any pertinent policy statement--

(A) issued by the Sentencing Commission

38

. . .

> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

The sentencing court "meaningful[ly] consider[s]" the factors by "acknowledg[ing] and respond[ing] to any properly presented sentencing argument which has colorable legal merit and a factual basis." United States v. Begin, 696 F.3d 405, 411 (3d Cir. 2012) (internal quotation marks and citations omitted). Yet the court does not need to "discuss and make findings as to each of the § 3553(a) factors if the record makes clear the court took the factors into account in sentencing." United States v. Jackson, 467 F.3d 834, 841 (3d Cir. 2006) (internal quotation marks and citations omitted). After considering the factors, the District Court imposed a custodial sentence within the guidelines sentencing range of 144 months on Kluger, which, as we have indicated, was the longest insider-trading sentence in history. But as we noted in Cooper, "'reasonableness is a range, not a point.'" United States v. Cooper, 437 F.3d 324, 332 n.11 (3d Cir. 2006) (citation omitted), abrogated on other grounds by Kimbrough v. United States, 552 U.S. 85, 128 S.Ct. 558 (2007).

Kluger argues that the District Court focused on "the seriousness of the offense" (§ 3553(a)(2)(A)) and on "afford[ing] adequate deterrence" (§ 3553(a)(2)(B)) to the exclusion of other factors, such as the "nature and circumstances

39

of the offense and the history and characteristics of the defendant" (§ 3553(a)(1)). According to Kluger, "the judge essentially did no more than mechanically recite the statutory words, rather than applying them to the defendant at hand." Appellant's br. at 41-42 (internal citation omitted). The Court, however, engaged in a thorough discussion of the "circumstances of the offense," such as the 17-year duration of the conspiracy and the fact that the conspirators continued the scheme even after learning of investigations by regulators on two separate occasions.[25] The Court, which has the discretion to determine the extent to which each factor merits discussion, also addressed "the history and characteristics of the defendant," such as Kluger's loving and supportive family, privileged childhood, and the ability of the Bureau of Prisons to manage his poor health during his incarceration.[26] See United States v. King, 604 F.3d 125, 144 (3d Cir. 2010) (citation omitted).

Kluger focuses his appeal on what he perceives was the vast disparity between his sentence and that of his co-conspirator Bauer as well as the sentences of other defendants convicted of insider trading throughout the country, particularly in the Southern District of New York, quite naturally the venue

---

[25] Although the District Court did not directly discuss the need to protect the public from Kluger, it addressed the harmful impact of insider trading on the broader public.

[26] Kluger also presented to the District Court that he is gay but separated from his former partner and that he and his former partner care for their three children including one with an autism spectrum disorder.

40

for numerous insider-trader prosecutions. Under § 3553(a)(6), a sentencing judge considers "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Courts apply § 3553(a)(6) to compare sentences between co-defendants or among defendants in separate cases, as long as the "defendants are similarly situated." King, 604 F.3d at 145 (citations omitted). Section 3553(a) "does not require district courts to consider sentencing disparity among co-defendants," but "it also does not prohibit them from doing so." United States v. Parker, 462 F.3d 273, 277 (3d Cir. 2006). Bauer, Kluger's co-conspirator, netted gains many times larger than those that Kluger obtained from the conspiracy but the Court nevertheless sentenced Bauer to a nine-year custodial term at the bottom of his guidelines range. The Court, on the other hand, sentenced Kluger to a 144-month custodial sentence, a term in the middle of his guidelines range.

Though there is an obvious disparity between Kluger's and Bauer's sentences there was a good reason for the District Court to have imposed a longer sentence on Kluger than on Bauer. In this regard, we cannot overlook the circumstance that Kluger served as the source of the information that permitted the scheme to function. Furthermore, Kluger was an attorney who took an oath to uphold the law. Moreover, it is really quite remarkable that Kluger could not even wait to graduate from law school before using his employment at a law firm to initiate his illegal activities and it is equally remarkable that during most of his legal career he was involved in criminal activity, so that in an actual though perhaps not in a legal technical sense as the term is used in the sentencing guidelines, he truly was a career

41

criminal. Furthermore, the presentence report makes clear that Kluger had a legitimate income well into six figures from his employment at various law firms, an income that should have made it seem less urgent to him to enhance by criminal activity. On the other hand, it is significant that Bauer had engaged in extensive community service work pre- and post-arrest that helped justify the within-guidelines sentence at the lower end of his range. In any event, Bauer and Kluger both received within-guidelines sentences, and such sentences generally do not lead to disparities requiring that a defendant be granted relief because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." Gall v. United States, 552 U.S. 38, 54, 128 S.Ct. 586, 599 (2007).

The District Court informed the parties at sentencing that it had examined a number of other insider-trading cases and recognized "that right now sentencing judges have expressed some dismay over the guidelines sentences applicable to some defendants."[27] App. at 87. The Court specifically mentioned the case of Winifred Jiau, who worked for a Silicon Valley expert network and was convicted of leaking secret information about tech companies to traders at hedge funds. See United States v. Jiau, 794 F. Supp. 2d 484, 485 n.2 (S.D.N.Y. 2011). Her sentencing guideline range amounted to six-and-a-half to

---

[27] The District Court even mentioned Morrison & Foerster's 2011 Insider Trading Annual Review cited by defense counsel as evidence of the widespread use of downward variances in such sentences.

42

eight years, but the district court nevertheless sentenced her to four years in prison. The sentencing court in the Jiau case explained: "There's no way that I'm going to impose a guideline sentence in this case [because] the guidelines give a mirage of something that can be obtained with arithmetic certainty." App. at 87 (internal quotation marks omitted).[28] But at Kluger's sentencing, the District Court distinguished between the Jiau case and Kluger's case. The overall profit attributed to Jiau's information was only $2.5 million, and the Jiau court exercised its discretion to sentence her based strictly on what she obtained from her offense.[29] On the other hand, in Kluger's case, the District Court found that "unlike the sentenc[es] where judges have seen no real connection between the guidelines driven by the amount of gain and the conduct of the individual defendant before [them]," there was no such disconnect in Kluger's case. Id. at 96.

Moving beyond Jiau, the District Court explained that many of the other below-guidelines sentences stemmed from

---

[28] See Walter Pavlo, Winifred Jiau Gets 4 Years in Prison, And What a Journey, Forbes (Sept. 21, 2011, 6:48 PM), http://www.forbes.com/sites/walterpavlo/2011/09/21/winifred-jiau-gets-4-years-in-prison-and-what-a-journey/.

[29] Though we use the term "only" in describing a profit of $2.5 million we do so because we are comparing $2.5 million to the sometimes far greater illegal gains involved in other so-called white collar criminal cases. Ordinarily, we, like most people, would not refer to $2.5 million as a small sum as to us, like most people, it is a lot of money.

43

agreements between the government and the defendant. For example, the Court discussed the case of Joseph "Chip" Skowron, who faced a guidelines range of 87-108 months but struck an agreement with the government pursuant to which the government recommended that the court impose a 60-month custodial sentence on him. The Court also discussed what it characterized as "the very notorious case" of Raj Rajaratnam that we addressed above in our discussion of Kluger's sentencing range. Rajaratnam, 2012 WL 362031. On May 11, 2011, a jury in the Southern District of New York convicted Rajaratnam on 14 counts of conspiracy and securities fraud, in a scheme that netted in excess of $60 million. Though Rajaratnam faced an applicable guidelines range of 235-293 months, the court sentenced him to a custodial term of 132 months in spite of the government's portrayal of him as the modern face of insider trading. The District Court here differentiated between Rajaratnam and Kluger on the grounds that in the latter's case, the "conduct [was] not just a trade, not just a series of trades over one company . . . [b]ut 17 years of trades and money laundering and obstruction of justice." App. at 90. By drawing the distinction, the Court not only demonstrated why Kluger was not similarly situated to Rajaratnam but also demonstrated that it took Kluger's 18 U.S.C. § 3553(a)(6) arguments into consideration.[30]

---

[30] We do not mean to suggest that defendants must have identical backgrounds to merit comparison under § 3553(a)(6). Yet we reiterate the explanation that we gave in United States v. Jimenez, 513 F.3d 62, 91 (3d Cir. 2008), in which we rejected the defendant's § 3553(a)(6) argument: "That [defendant] can

44

Unfortunately for Kluger, the District Court found that his actions constituted "a more thuggish, more direct example of taking other people's stuff. And at [the] same time for all its acridity, a highly successful scheme because of the money laundering. Because of the simplicity, because of the limited number of people involved in it. Because of the discipline." App. at 90. The Court added: "I don't know any of the other defendants who are accused of individual trades. . . . Not a pattern of how one runs a hedge fund but individual trades. I haven't seen any of them with this number of trades. And this consistency of engaging in insider information." Id. at 97. Moreover, the Court differentiated between Kluger and other lawyers who have been convicted of insider trading: "[T]he lawyers who have otherwise been prosecuted did not perform[] the kind of [wholesale] purloining of information on a regular and steady basis . . . ." Id.

In the end, "[t]he touchstone of 'reasonableness' is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." Grier, 475 F.3d at 571 (footnote and citations omitted). We find that the record more than meets that requirement, especially

find another case where a defendant charged with a somewhat similar crime and facing the same advisory sentencing range received a sentence outside of the applicable sentencing range does not make [defendant's] within-Guidelines sentence unreasonable. If that were the law, any sentence outside of the Guidelines range would set precedent for all future similarly convicted defendants. This is not, and cannot be, the law."

45

because we "'give due deference to the district court's determination that the § 3553(a) factors, on a whole,' justify the sentence."[31] Tomko, 562 F.3d at 568 (citations omitted). As long as "the district court's sentence is procedurally sound, we will affirm it unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." Id. Here, we do not find that no other reasonable sentencing court would have imposed the sentence.

### b. Substantive Reasonableness

Once we are satisfied, as we are here, that a district court did not commit procedural error, we review the sentence for substantive reasonableness. See United States v. Negroni, 638 F.3d 434, 443 (3d Cir. 2011). As noted above, the District Court imposed a within the guidelines custodial sentence of 144 months, and therefore we take into account our recognition that "[a] sentence that falls within the recommended Guidelines range, while not presumptively reasonable, is less likely to be unreasonable than a sentence outside the range." United States v. Lessner, 498 F.3d 185, 204 (3d Cir. 2007) (citation omitted).

Kluger's focus on the procedural aspects of the sentence offers little in the way of substantive argument regarding what

---

[31] "[T]he district court's superior vantage point compels us to give due deference to [its] determination that the § 3553(a) factors, on a whole, justify the sentence." United States v. Merced, 603 F.3d 203, 214 (3d Cir. 2010) (alteration in original) (internal quotation marks and citations omitted).

he believes was the District Court's "draconian sentence." Appellant's br. at 46. He provides an overview of mitigating factors that echoes the arguments under § 3553(a)(1) that we already have discussed regarding his history and characteristics. Kluger reiterates his argument that the sentence is particularly unreasonable as compared to that imposed on Bauer, who reaped millions more in profits and yet received a custodial sentence of 108 months at the bottom of his guidelines range which was shorter than that imposed on Kluger. Yet Kluger's argument does not give adequate attention to the circumstance that he received a two-level sentencing enhancement for abusing his position of trust as an attorney and did not perform a commensurate level of community service pre- and post-arrest as did Bauer, thereby qualifying Kluger for a higher guideline range and justifying his mid-range sentence.

After reiterating the § 3553(a) factors, Kluger summarily concludes that his sentence fails the test of substantive reasonableness and then quotes from Judge Fisher's dissent in Tomko to support his position that: "[I]f substantive reasonableness review is to mean anything, courts of appeals must attempt to give content to this component of our review until the Supreme Court provides further guidance." Tomko, 562 F.3d at 591 (Fisher, J., dissenting). But the concern that Judge Fisher expressed in his Tomko dissent is certainly not a concern here. We do not doubt that Kluger received a fairly severe sentence as compared to Bauer and to other defendants in insider-trading cases who were convicted in the Southern District of New York. Yet we do not exercise plenary review when examining the substantive reasonableness of a sentence, and the District Court set forth adequate reasons "to satisfy [us]

47

that [it] considered the parties' arguments and [had] a reasoned basis for exercising [its] own legal decisionmaking authority." Merced, 603 F.3d at 215-16 (citing Rita v. United States, 551 U.S. 338, 356, 127 S.Ct. 2456, 2468 (2007)). Furthermore, "'[t]he fact that [we] might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.'" Tomko, 562 F.3d at 560 (citation omitted).[32] The District Court was in a superior position than we are to make the sentencing determination in this case, and we afford great deference to its decision. Kluger, as the challenging party, fails to meet his burden to overcome the deference that we owe the District Court's determinations and we cannot say that "no reasonable sentencing court" would have imposed the same sentence that it imposed. Consequently, we will not disturb the sentence on the grounds that it was substantially unreasonable. See id. at 568.

## V. CONCLUSION

For the foregoing reasons, we will affirm the judgment of conviction and sentence entered June 4, 2012.

---

[32] We are not implying that if we had imposed the sentence in the first instance that we might have imposed a shorter sentence. We simply are making it clear that even if we would have done so that circumstance would not require that we reverse here.

48