PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3813
_____

UNITED STATES OF AMERICA

v.

STEVEN METRO,
Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-15-cr-00028-001)
District Judge:  Hon. Michael A. Shipp

_____

Argued
November 6, 2017

Before:  JORDAN, HARDIMAN and SCIRICA, *Circuit
Judges.*

(Filed: February 14, 2018)
_____

Anne M. Collart
Lawrence S. Lustberg   [ARGUED]
Gibbons
One Gateway Center
Newark, NJ   07102

Steven Metro (*pro se*)
32 Old Village Lane
Katonah, NY   10536
    *Counsel for Appellant*

Mark E. Coyne
Office of United States Attorney
970 Broad St. – Rm. 700
Newark, NJ   07102

Glenn J. Moramarco   [ARGUED]
Office of United States Attorney
401 Market Street
Camden, NJ   08101
    *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Steven Metro appeals from the 46-month sentence of imprisonment imposed by the District Court as a consequence of his guilty plea to one count of conspiracy to violate federal securities laws and one count of insider trading.  He contends that the Court wrongly attributed to him illicit financial gains

2

actually attributable to someone with whom he was not acting in concert and to whom he did not provide inside information. Because the District Court's factual findings are insufficient to support the sentence, we will vacate and remand for resentencing.

## I.    Background[1]

### A.    The Insider Trading Scheme

Metro, a former managing clerk at a prominent New York City law firm, engaged in a five-year insider trading scheme in which he abused his position at the firm by disclosing material nonpublic information to his close friend Frank Tamayo. The pattern of Metro's criminal activity remained fairly constant throughout the multi-year scheme. Between February 2009 and January 2013, he used his position at the law firm to obtain material nonpublic information concerning thirteen distinct corporate transactions. In each instance, after obtaining the inside information, he would meet with Tamayo and tell him which stocks to purchase and when. Tamayo would then write down the stock symbols of the companies whose stock he was about to acquire.

After Tamayo left those meetings with Metro, he would call his personal stockbroker, Vladimir Eydelman, and arrange to meet him, typically at Grand Central Station. Tamayo would show Eydelman the stock symbols he had written down

---

[1] The facts that follow are drawn from the record that was before the District Court at sentencing. They are not in dispute, unless otherwise noted below.

and Eydelman would commit them to memory. Tamayo would then tell Eydelman when to make the trades.

Eydelman made such trades not only for Tamayo but also on behalf of himself, his family, his friends, and other brokerage clients. Metro, by and large, did not hold the involved stocks himself and did not collect proceeds from the trades. Rather, he relied on Tamayo to reinvest the proceeds from their unlawful trades in future insider trading. When all was said and done, the insider trading by Eydelman, Tamayo, and Metro, based on Metro's tips, resulted in illicit gains of $5,673,682. The District Court attributed that entire sum to Metro in determining the length of his sentence.

Metro denies being aware of Eydelman's existence until one year after he relayed his last tip to Tamayo, and he contends that he never intended any of the tips he provided to Tamayo to be passed to a broker or any other third party.

### B.    Tamayo Cooperates with the Government

The trading activity based on Metro's inside information did not go unnoticed by the government. Eventually, an investigation was launched and government agents executed a search warrant at Tamayo's home in or around December 2013. Tamayo promptly admitted his role in the scheme and began cooperating with the government. That cooperation included recording a January 28, 2014, meeting with Metro in which Metro expressed his desire to liquidate some of the gains that had accrued since 2009, so he could fund a real estate transaction. Tamayo responded that he had asked his stockbroker – who was unnamed in the conversation – to help liquidate some of the assets held in

4

Tamayo's retirement account. A portion of that conversation follows, as set forth in a transcript created by the government and provided to the District Court.

> TAMAYO: [M]y stock broker . . . I also asked him to see if he can get me, like, 30K for you. Um, because I know you, um, so that might help.
>
> *[METRO]*: That would help, yeah. Yeah, that would help.
>
> TAMAYO: But, you know, because I know that he [the stock broker], obviously, has to, you know, in order to, uh, you know, to make everything look kosher, he passed it [the Inside Information] to a couple of his clients, you know.
>
> *[METRO]*: Okay.
>
> TAMAYO: So I said to him [the stock broker], um, I said, listen, is there any way you can give me like 30K, 'cause I can't take it out of my, you know, because all that money is tied up in my retirement.
>
> *[METRO]*: Right, sure, sure, right.
>
> TAMAYO: So he [the stock broker] said, he's thinking about it. I'm actually going to meet with him again, um, you know like Monday or Tuesday of next week. And then he's gonna, he's gonna see if he can get me cash.
>
> *[METRO]*: Alright.

5

TAMAYO: So that should be good.

[METRO]: That works. Yeah, that totally works.

...

TAMAYO: If I get my broker to give you, you know, at least 30K, you know, we'll take it off the. . .

[METRO]: Right, right.

TAMAYO: . . . the, uh, the 168 [[Metro's] accrued share of the insider trading profits], there, so. Um, alright, so, let's see . . .

[METRO]: Yeah, because we're all cashed out at this point, right?

TAMAYO: Yeah.

[METRO]: We're not holding anything.

TAMAYO: No, do you, um . . .

[METRO]: But I'm going to . . . if I can't use the money, I'm not going to leave that money there, doing nothing.

TAMAYO: Uh hum. Yeah, . . . um . . .

[METRO]: You know what I mean? That doesn't make sense to me. . .

TAMAYO: Yeah, I mean, it's been a while, right?

*[METRO]*: For us, it's been a long time. But, I'm just saying even if . . .

TAMAYO: No, no, as far as the last one we did [the last insider trading].

*[METRO]*: Yeah, yeah. Like a year, or kind of a little bit . . . but I'm not even saying that, I'm saying a legit thing. Because why not, I mean, that money should be making me money, rather than just sitting in a cash value.

TAMAYO: Absolutely. Um, he actually, the broker actually asked me about it—he's like, anything new? I was like, no, you know, so.

*[METRO]*: But those tips, they really don't pay off. I mean they pay off for us, but, what good is giving him [the stock broker] a tip?

TAMAYO: I know.

*[METRO]*: It's not making me any money.

TAMAYO: Yeah, but you know the thing is that, it's good because, it actually, you know, covers up a little bit, that's all.

*[METRO]*: Yeah, no, it's true. But you think he [the stock broker] would kick you something for the [tips].

7

TAMAYO: I know, absolutely. He might be the cheapest bastard around.

(App. at 175-77 (non-italicized alterations in original).)

Metro also told Tamayo during that conversation that "[i]f anything comes up, I'll let you know about it for sure." (Presentence Report ¶ 97.) The government arrested Metro less than two months after that meeting.

### C. The Presentence Report and Metro's Objections

After he was caught, Metro pled guilty to conspiracy to violate the securities laws[2] in violation of 18 U.S.C. § 371, and insider trading in violation of 15 U.S.C. §§ 78j(b) and 78ff. The Presentence Report ("PSR") set forth an analysis of Metro's sentencing exposure under the United States Sentencing Guidelines ("U.S.S.G." or "guidelines"). Specifically, the PSR applied § 2B1.4 of the guidelines, the provision relevant to insider trading, to calculate the offense level that would determine, in part, the appropriate sentencing range. Pursuant to that section, Metro's base offense level was 8. Because the gain resulting from his conduct exceeded $6,500, the guidelines, under § 2B1.4(b)(1), called for an "increase by the number of levels from the table in § 2B1.1[.]" U.S.S.G. § 2B1.4(b)(1). As the PSR attributed all $5.6 million in illicit gains to Metro, an 18-level increase was directed by §

---

[2] The indictment charged Metro with conspiracy to commit securities and tender offer fraud. For ease of reference, we describe that charge throughout this opinion as a conspiracy to violate the securities laws.

8

2B1.1(b)(1)(J). An additional 2-level increase pursuant to § 3B1.2 was added because Metro had abused his position of trust as an employee with management responsibilities at the law firm. Finally, because Metro pled guilty and acknowledged his criminal behavior, the PSR credited him with accepting responsibility and hence allowed a 3-level reduction in his offense level, pursuant to § 3E1.1(a) and (b). Based on a total offense level of 25 and Metro's criminal history category of I, the recommended guidelines range was 57 to 71 months of imprisonment.

Metro objected to the attribution to him of all the gains realized as a result of Eydelman's trades. He argued in a presentence filing with the District Court that he was not, in the language of commentary to guidelines § 2B1.4, "acting in concert" with Eydelman such that Eydelman's gains should be attributed to him for purposes of sentencing.[3]

### D.    Sentencing Hearing and Sentence

At the sentencing hearing, Metro renewed his objection to the PSR's 18-level enhancement based on all $5.6 million of illicit gains from the scheme. In response, the government described for the District Court its theory of the case: namely, that this was "a three-party scheme[,]" with Metro as the insider, Tamayo as the middleman, and Eydelman as the stockbroker. (App. at 79.) After the District Court asked whether the law requires that Metro "know of Mr. Eydelman in order to have" responsibility for Eydelman's gains, the

---

[3] Metro also objected to the abuse of position of trust enhancement. The District Court's resolution of that objection is not a subject of this appeal.

government answered that the law only requires that Metro "know that there is somebody else that is obtaining the inside information that he is passing on. And [the government has] to show that all three gentlemen were acting in concert." (App. at 81-82.) The government then argued that it had met those requirements because Eydelman, the ultimate recipient of Metro's tips, was critical to the insider trading, and that the January 28, 2014, conversation demonstrated Metro's awareness of Eydelman's existence.

Metro disputed the government's characterization of the January 28 conversation, arguing that it did not support a finding that he had acted in concert with Eydelman because the conversation took place one year after the last time Metro provided an inside tip. According to Metro, he first learned that a broker (i.e., Eydelman) was involved with the scheme shortly before that conversation, and no fair interpretation of his responses shows that he had been aware of Eydelman when he (Metro) was passing information to Tamayo.

The District Court overruled Metro's objection to the PSR's attribution of the full $5.6 million to him. Without making any explicit factual findings on the record, the Court stated that "[t]he commentary [to § 2B1.4] unequivocally attributes all the gains made by Tamayo and Eydelman to Metro. … So with that, the Court also finds that *United States v. Kluger*, 722 F.3d 549 (3d Cir. 2013) is also on point and analogous[.]"[4] (App. at 97.)

---

[4] As more fully discussed herein, *Kluger* deals with the attribution, for sentencing purposes, of insider trading gains. 722 F.3d at 557.

10

When handing down Metro's sentence, the District Court used the PSR's guideline imprisonment range of 57 to 71 months as a starting point. It then granted a two-level downward variance because of Metro's "strong family ties" and "redeemable qualities," resulting in a guideline imprisonment range of 46 to 57 months. The Court sentenced Metro to a 46-month term of imprisonment, a three-year term of supervised release, a $10,000 fine, and a $200 special assessment. Metro now appeals that sentence.

## II.    Discussion[5]

The District Court rightly looked to the insider trading-specific guideline, § 2B1.4, in sentencing Metro. As already noted, that section provides for a base offense level of 8, and then says that "[i]f the gain resulting from the offense exceeded $6,500, increase by the number of levels from the table in § 2B1.1 … ." U.S.S.G. § 2B1.4(b)(1). The commentary to the section explains that:

> … Insider trading is treated essentially as a sophisticated fraud. Because the victims and their losses are difficult if not impossible to identify, the gain, i.e., *the total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information*, is employed instead of the victims' losses.

---

[5]  The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 18 U.S.C. § 3742(a)(1) and 28 U.S.C. § 1291.

U.S.S.G. § 2B1.4 cmt. background (emphasis added). Relying on that commentary, the District Court attributed to Metro all of the gains realized from Eydelman's illegal trades, which amounted to approximately $5.6 million. Metro argues that the Court failed to make sufficient factual findings to support that attribution and gave too broad a meaning to the phrase "acting in concert." We agree.

## A.    General Principles and *Kluger*

"[W]e review the District Court's interpretation of the Sentencing Guidelines *de novo*," its "findings of fact for clear error[,]" and its "application of the Guidelines to facts for abuse of discretion." *Kluger*, 722 F.3d at 555 (citations omitted). The federal sentencing guidelines are to be understood according to their "plain and unambiguous language[.]" *Id.* at 556 (quoting *United States v. Wong*, 3 F.3d 667, 670 (3d Cir. 1993)). Commentary interpreting or explaining a specific guideline "is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993). A failure to properly calculate a guidelines range is a "significant procedural error." *Gall v. United States*, 552 U.S. 38, 51 (2007). Accordingly, "the use of an erroneous … range will typically require reversal[.]" *United States v. Langford*, 516 F.3d 205, 215 (3d Cir. 2008); *see also United States v. Merced*, 603 F.3d 203, 214 (3d Cir. 2010) ("If the district court commits procedural error, our preferred course is to remand the case for re-sentencing, without going any further.").

12

With those general principles in mind, we turn to a review of our decision in *United States v. Kluger*, which features prominently in the District Court's decision and the parties' arguments on appeal.

*Kluger* involved an insider trading scheme that, like the one here, had an insider at a law firm disclosing material nonpublic information to a middleman who, in turn, relayed that information to a stockbroker who ultimately executed the illegal trades. 722 F.3d at 553-54. At sentencing, the district court attributed to the law firm insider all of the gains realized by the stockbroker, even though the insider argued that those gains were not foreseeable because the stockbroker traded "in share volumes far in excess of the number of shares that the … conspirators agreed would be traded." *Id.* at 554. On appeal, the insider challenged the district court's gain analysis by arguing that the foreseeability test set out in § 1B1.3(a)(1)(B) should have lowered the "gain" attributed to him. *Id.* at 557. Under the version of the guidelines in effect at the time the defendant was sentenced, § 1B1.3(a)(1) stated:

> (a) … *Unless otherwise specified*, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:
>
> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

13

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), *all reasonably foreseeable acts* and omissions of others in furtherance of the jointly undertaken criminal activity[.]

U.S.S.G. § 1B1.3(a)(1) (2010) (emphasis added). In affirming the district court's gain calculation, we determined that "the insider-trading guideline falls under the 'unless otherwise specified' exception of § 1B1.3," such that § 1B1.3's foreseeability test does not apply to the gain analysis required by § 2B1.4's commentary. *Kluger*, 722 F.3d at 558-59. We reached that conclusion because that gain analysis "unequivocally attributes" to a defendant all the gains realized through trading by individuals "acting in concert with the defendant" or "to whom the defendant provided inside information," without regard to the foreseeability of those gains. *Id.* at 558 (quoting U.S.S.G. § 2B1.4 cmt. background). Critical to our conclusion in *Kluger* was the defendant's admission that he was "acting in concert with" the stockbroker and that he "provided inside information" with the intent that it reach the stockbroker. *Id.*[6] Metro, in contrast, strenuously

---

[6] We emphasized those facts four separate times in *Kluger*. *See* 722 F.3d at 558 ("[The stockbroker] was a 'person[] acting in concert with the defendant,' as well as one 'to whom the defendant provided inside information.'" (citation omitted)); *id.* at 559 n.13 ("[W]e observe that it is undisputed that [the defendant] passed inside information to [the middleman] with the intent that the information would

14

disputes that he either acted "in concert with" or "provided inside information" to Eydelman.

**B.** ***Kluger* Did Not Render § 1B1.3 Irrelevant for Purposes of Determining the Scope of Conduct for Which a Defendant Can Be Held Accountable at Sentencing**

Adopting the approach taken in the PSR, the District Court concluded that *Kluger* controlled the sentencing outcome here. That of course was also the government's position, but the only evidence offered by the government to establish that Metro had any knowledge of Eydelman, or that Metro had any awareness that his insider tips were received by anyone other than Tamayo, was the January 28, 2014, transcript. Metro objected throughout sentencing to the conclusion in the PSR that he acted "in concert with" or "provided inside information" to Eydelman, and he disputed that the January 28, 2014, transcript established that he had. The District Court, at Metro's sentencing hearing, neither resolved those factual disputes nor made any other factual findings with regard to Metro's relationship with, or knowledge of, Eydelman. The Court appears to have

---

reach [the stockbroker] who [the defendant] knew was a securities trader in order for [the stockbroker] to place illicit trades."); *id.* at 561 ("[The stockbroker] is explicitly an individual 'to whom the defendant provided inside information.'" (citation omitted)); *id.* at 561 n.19 ("[The defendant] intended [the stockbroker] to be the ultimate tippee because [the defendant] knew that [the middleman] would not exercise the vast majority of the trades on behalf of the conspirators.").

concluded either that, in light of *Kluger*, Metro's guilty plea to a conspiracy count naming Eydelman was a sufficient basis to establish the "in concert with" or the "provide inside information to" requirements for the attribution of gains, or that *Kluger* requires that courts hold tippers accountable at sentencing for all downstream trading resulting from that tipper's inside information. Both interpretations take *Kluger* too far.

Metro pled guilty to Count 1 of the indictment, which charged him with conspiring with "Tamayo, Eydelman, and others" to violate the securities laws. (App. at 26.) It is clear, however, that the guidelines do not consider a defendant's criminal liability to be co-extensive with sentencing accountability. The commentary to the guidelines' "Relevant Conduct" provision, § 1B1.3, is explicit that "[t]he principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability," U.S.S.G. § 1B1.3 cmt. 1, and further that, "[b]ecause a count may be worded broadly and include the conduct of many participants over a period of time, the scope of" a defendant's conduct for sentencing purposes "is not necessarily the same as the scope of the entire conspiracy," U.S.S.G. § 1B1.3 cmt. 3(B). We have thus explained that the conduct a defendant is typically held responsible for under the guidelines "is not coextensive with conspiracy law." *United States v. Mannino*, 212 F.3d 835, 842 (3d Cir. 2000) (emphasis omitted) (quoting *United States v. Collado*, 975 F.2d 985, 997 (3d Cir. 1992)).[7] For that reason, we have instructed that, at

_____

[7] *See also United States v. Getto*, 729 F.3d 221, 234 n.11 (2d Cir. 2013) ("[T]he scope of conduct for which a defendant can be held accountable under the sentencing

16

sentencing, it is essential for courts to conduct "a searching and individualized inquiry into the circumstances surrounding each defendant's involvement in [a] conspiracy … to ensure that the defendant's sentence accurately reflects his or her role." *Collado*, 975 F.2d at 995. The question we are faced with now is whether those fundamental sentencing principles apply with equal force in the insider trading context, given our decision in *Kluger*, and the answer is they do.

*Kluger* does not mandate that § 1B1.3, and its guidance on the importance of individual accountability at sentencing, plays no role in determining the scope of a defendant's relevant conduct in insider-trading conspiracy cases. That case holds, rather, that § 1B1.3's foreseeability requirement is inapplicable to an analysis of illicit gain under § 2B1.4. *See Kluger*, 722 F.3d at 558-59 ("[T]he insider-trading guideline falls under the

---

guidelines is significantly narrower than the conduct embraced by the law of conspiracy." (citation omitted)); *United States v. Spotted Elk*, 548 F.3d 641, 674 (8th Cir. 2008) ("[T]he emphasis under § 1B1.3 is the scope of the *individual defendant's* undertaking … rather than the scope of the conspiracy as a whole[.]"); William W. Wilkins, Jr. & John R. Steer*, Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines*, 41 S.C. L. Rev. 494, 510 (1990) [hereinafter *Relevant Conduct*] (explaining that in "concerted activity situations," the guidelines attempted to create a sentencing rule that was "not necessarily co-extensive with … co-conspirator liability"). At the time *Relevant Conduct* was published, Judge Wilkins was Chairman of the United States Sentencing Commission, and Steer was the Commission's General Counsel. *Relevant Conduct*, 41 S.C. L. Rev. at 495 n.a & aa.

'unless otherwise specified' exception of § 1B1.3, and, as a result, we will not use the reasonable foreseeability test in reviewing the District Court's calculation of the offense level[.]"); *id.* at 559 ("In the circumstances we should not look beyond the plain language of § 2B1.4 and read a foreseeability test into § 2B1.4."). The "unless otherwise specified" exception is not an all-or-nothing proposition. Just because one subsection of § 1B1.3 does "not apply to a particular count of conviction does not mean that other subsections of the relevant conduct provision cannot be given effect." *United States v. Maddox*, 803 F.3d 1215, 1223 (11th Cir. 2015).

Amendments made by the United States Sentencing Commission to § 1B1.3 after *Kluger*, and that were given effect prior to Metro's sentencing, support our conclusion that § 1B1.3 remains important even in an insider trading case. The 2015 version of § 1B1.3 amended subsection (a)(1)(B), the provision containing guidance on when a court is to hold a defendant accountable for the conduct of others "in the case of a jointly undertaken criminal activity[.]" U.S.S.G. § 1B1.3(a)(1)(B). In the pre-2015 version of the guidelines that *Kluger* interpreted, that specific subsection instructed courts to hold defendants responsible "in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)[] [for] all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity[.]" U.S.S.G. § 1B1.3(a)(1)(B) (2011). Following the 2015 amendments, § 1B1.3(a)(1)(B) now instructs courts to hold a defendant responsible,

18

in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), [for] all acts and omissions of others that were—

    (i)      within the scope of the jointly undertaken criminal activity,

    (ii)    in furtherance of that criminal activity, and

    (iii)   reasonably foreseeable in connection with that criminal activity[.]

U.S.S.G. § 1B1.3(a)(1)(B) (2015).

The amendment placed within the text of the guideline three distinct factors for courts to consider when conducting the § 1B1.3(a)(1)(B) analysis. By its own account, the Sentencing Commission amended the guideline to "clarify the use of relevant conduct in offenses involving multiple participants." U.S.S.G. Supp. to App. C, Amend. 790, Reason for Amend. While the amendment did not signal a "substantive change in policy," it did clarify that courts should go through a three-step analysis before attributing the conduct of others to a defendant facing sentencing. *Id.* That analysis requires courts to "(1) identify the scope of the jointly undertaken criminal activity; (2) determine whether the conduct of others in the jointly undertaken criminal activity was in furtherance of that criminal activity; and (3) determine whether the conduct of others was reasonably foreseeable in connection with that criminal activity." *Id.* The main point of the amendment was

19

to take the "scope" step of the analysis out of the commentary and place it "in the text of the guideline itself." *Id.*

*Kluger* had no occasion to address the "scope" of the jointly undertaken criminal activity because it was not disputed that the defendant was aware of, and acting with, the stockbroker. 722 F.3d at 559 n.13. Rather, the *Kluger* Court's analysis focused on whether conduct that was admittedly within the scope of and in furtherance of the jointly undertaken criminal activity also had to be foreseeable to be attributable to an insider-trading defendant. *Id.* at 557-61. In short, the question of scope was not on the table in *Kluger*, but it is here, and it may be in other insider trading cases.

We therefore hold that § 1B1.3 remains relevant when attributing to an insider-trading defendant gains realized by other individuals. Before attributing gains to a defendant under § 2B1.4's gain analysis, a sentencing court should first identify the scope of conduct for which the defendant can fairly be held accountable for sentencing purposes under § 1B1.3. After identifying the scope of conduct, the court should then analyze that conduct to determine whom the defendant "act[ed] in concert with" and to whom he "provided inside information[.]" U.S.S.G. § 2B1.4 cmt. background. That may lead the court to attribute to a defendant gains realized by downstream trading emanating from the defendant's tips, but, depending on the facts established at sentencing, it may not.[8] *Kluger* does not

---

[8] We emphasize that a defendant cannot artificially limit his sentencing exposure by utilizing a middleman to convey inside information to a third party to conduct illegal trades when that defendant had reason to know, or was

impose, as the government suggests, "what amounts to strict liability" on tippers, regardless of whether or not the tipper had any knowledge at the time he was providing the inside information that it would reach an individual other than the individual to whom he provided it. (Answering Br. at 26.) In fact, the government's own argument to the District Court undercuts the position it has taken before us. When asked by the District Court whether Metro had to "know of Mr. Eydelman in order to have" responsibility for Eydelman's gains, the government answered that the law requires that Metro "know that there is somebody else that is obtaining the inside information that he is passing on. And [the government has] to show that all three gentlemen were acting in concert." (App. at 81-82.)

Because "the attribution of gains to a defendant can be critical in a guidelines sentencing range calculation," *Kluger*, 722 F.3d at 556, the "strict liability" position now taken by the government runs the risk of sentences being imposed on defendants that are excessive in relation to their criminal conduct.[9] Our holding today avoids that risk but remains fully

---

willfully blind to the fact that, the middleman was passing the inside information to third parties.

[9] We are not alone in looking to § 1B1.3 to provide the proper analytical framework for assessing the scope of a defendant's conduct for sentencing purposes in the insider trading context. Other courts of appeals have looked to that provision for that purpose for decades. *United States v. Nacchio*, 573 F.3d 1062, 1072-73 (10th Cir. 2009); *United States v. O'Hagan*, 139 F.3d 641, 655-56 (8th Cir. 1998);

21

in line with *Kluger*. Once a sentencing court identifies the scope of conduct for which a defendant can be fairly held accountable, whether consequences flowing from that conduct were foreseeable is not pertinent to § 2B1.4's gain analysis.

### C. The District Court Did Not Address Critical Factual Disputes Relevant to the Scope of Metro's Conduct for Sentencing Purposes

Since we have concluded that district courts must look to § 1B1.3 to determine the scope of conduct for which a defendant can be held accountable for sentencing purposes, we must now consider whether the District Court made "a searching and individualized inquiry into the circumstances surrounding [Metro's] involvement in the conspiracy … to ensure that [Metro's] sentence accurately reflect[ed] his … role." *Collado*, 975 F.2d at 995. A district court does not meet that requirement if it fails to comply with the guidelines' instruction to "resolve disputed sentencing factors at a sentencing hearing in accordance with [Federal Rule of Criminal Procedure] 32(i)." U.S.S.G. § 6A1.3(b). That rule mandates that, "[a]t sentencing, the court … must – for any disputed portion of the presentence report or other controverted matter – rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing … ." Fed. R. Crim. P. 32(i). The rule is "strictly enforced" and requires that "[a] finding on a disputed fact or a disclaimer of reliance upon a disputed fact … be expressly made." *United States v. Electrodyne Sys. Corp.*, 147 F.3d 250,

---

*United States v. Stern*, No. 92-3752, 1993 WL 82048, at *4 (5th Cir. Mar. 12, 1993) (not precedential).

22

255 (3d Cir. 1998); *see also United States v. Freeman*, 763 F.3d 322, 339 (3d Cir. 2014) ("[I]f a defendant disputes a fact included in the presentence investigation report, the sentencing court must either resolve that dispute or state that it will not rely on the disputed fact." (citation omitted)). A district court's failure to comply with Rule 32(i)(3)(B) "is grounds for vacating the sentence." *Electrodyne Sys.*, 147 F.3d at 255.

The government offered only the January 28, 2014, transcript to establish its factual contentions. Metro, for his part, clearly objected to the government's position that he "acted in concert with" or "provided inside information" to Eydelman. The District Court never resolved those factual disputes on the record; it simply overruled Metro's objection and concluded that *Kluger* was controlling. Had the Court's assessment of *Kluger* been correct, it may have been justified in viewing as moot the factual disputes raised by Metro. But, as we have discussed, the assessment was in error. Accordingly, the factual disputes are very much alive and the obligation of Rule 32(i)(3)(B) to resolve those disputes remains in force.

When the scope of a defendant's involvement in a conspiracy is contested, a district court cannot rely solely on a defendant's guilty plea to the conspiracy charge, without additional fact-finding, to support attributing co-conspirators' gains to a defendant. Because the District Court here did not resolve the key factual dispute raised by Metro, or otherwise provide a factual basis to support its gain analysis, there was not the "searching and individualized inquiry" necessary to ensure Metro's sentence matched his role in the conspiracy.

**D.    A Guilty Plea Alone Is Not Necessarily Determinative of Sentencing Accountability**

In reaching our conclusion, we do not imply that a defendant can contest at sentencing the factual averments contained in an indictment to which he pled guilty. *See United States v. Parker*, 874 F.2d 174, 177 n.1 (3d Cir. 1989) (holding that pleading guilty "binds [a defendant] to the accuracy of the facts set forth in the indictment").  That issue is not before us today because the indictment to which Eydelman pled guilty contains no facts actually linking Metro to Eydelman.  Though it charged Metro with "knowingly and willfully combin[ing], conspir[ing] and agree[ing] with Tamayo, Eydelman, and others" to violate the securities laws, (App. at 26-27,) the indictment did not set out any factual basis showing that Metro "acted in concert with" or "provided inside information" to Eydelman for purposes of sentencing accountability.  Similarly, the PSR does not contain any facts linking Metro to Eydelman, other than referring to the fact that Metro was charged with conspiring with Eydelman.  And although the government could have elicited facts from Metro at his plea hearing to tie him to Eydelman, it did not.

On the contrary, at the plea hearing, the government established only that Metro learned about Eydelman after the insider trading activity had ended.[10]  It asked Metro whether he

---

[10] Federal Rule of Criminal Procedure 11 instructs that "[b]efore entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea."  Fed. R. Crim. P. 11(b)(3).  Here, rather than conducting the colloquy with Metro to determine whether there was a sufficient factual basis to support entering judgment on the guilty plea, the Court

"enter[ed] into an agreement with Frank Tamayo to engage in securities transactions based on material nonpublic information," to which Metro responded, "Yes," but it did not ask whether he entered into an agreement with Eydelman. (App. at 67.) The government next asked whether Metro "disclose[d] the inside information to Tamayo," to which Metro responded, "Yes." (App. at 67.) It did not ask if he disclosed information to Eydelman. The government asked whether, between February 2009 and January 2013, Metro "provide[d] Tamayo inside information related to at least 13 different corporate transactions so that Tamayo could profit by trading on the inside information[,]" to which Metro responded, "Yes." (App. at 69.) The government did not ask whether he provided that information with the intent that it reach Eydelman. The government further asked, "[w]ith respect to the overt acts charged in the indictment, do you acknowledge that you and Frank Tamayo each had a defined role to perform certain specific acts in furtherance of your agreement to [violate the securities laws]," to which Metro replied, "Yes." (App. at 69.) The government did not ask about Eydelman's role, if any, in that agreement. The only fact the government did elicit from Metro concerning Eydelman was that "[a]fter [his] arrest," Metro "learn[ed] that Tamayo used a broker named Vladimir Eydelman[.]" (App. at 69.)

The government must prove facts supporting a sentencing enhancement by a preponderance of the evidence. *United States v. Napolitan*, 762 F.3d 297, 309 (3d Cir. 2014); *United States v. Tai*, 750 F.3d 309, 318-19 (3d Cir. 2014). Perhaps the District Court thought that the government had met

---

requested the government to develop the factual basis by questioning Metro.

its burden to demonstrate that Metro "acted in concert with" or "provided inside information" to Eydelman, but the record gives us no basis to say that the Court indeed reached that conclusion. In any event, the record is insufficient to support the sentence given.

### III. Conclusion

For the foregoing reasons, we will vacate Metro's sentence and remand the case for resentencing after the District Court has determined whether the government has established by a preponderance of the evidence that Metro "acted in concert with" or "provided inside information" to Eydelman. The Court is free to reopen the record, should it determine that further development of the record is in order.